The STATE of Texas, Appellant,

v.

Eugene X. MERCIER, Appellee.

No. 13–02–491–CR.

Court of Appeals of Texas,
Corpus Christi–Edinburg.

May 19, 2005.

Rehearing En Banc and Rehearing
Overruled June 23, 2005.

Amy Howell Alaniz, Asst. Dist. Atty., Rene A. Guerra, Criminal Dist. Atty., Edinburg, for appellant.

Joseph A. Connors, III, McAllen, for appellee.

Before Justices HINOJOSA, YAÑEZ and CASTILLO.

## OPINION

Opinion by Justice CASTILLO.

The State appeals from an order of the district court granting a motion for new trial, entering an acquittal, and entering conditional orders pendent on future appeals. *See* TEX.CODE CRIM. PROC. ANN. art. 44.01(a)(2), (3) (Vernon Supp.2004–05). The underlying offense is conspiracy to commit barratry. We reverse the trial court's order and remand.

## I. BACKGROUND

The trial court granted appellee Eugene X. Mercier's motion for new trial after a jury returned a guilty verdict for criminal conspiracy and acquitted him on all other counts.[1] By four issues, appellant, the State of Texas, asserts that the trial court erred in: (1) entering an order containing

conditional post-appeal dispositions; (2) finding the evidence legally insufficient to sustain the conviction; (3) conditionally dismissing the indictment; and (4) conditionally granting a new trial.[2] By sixteen cross-points,[3] Mercier asserts, in general, lack of jurisdiction, failure to preserve error, insufficiency of the evidence to sustain the conviction, *Brady* violations,[4] *Kyles* violations,[5] limitations, and federal constitutional violations and deprivation of rights.

### A. Procedural History

The indictment charged Mercier with four counts of barratry and two counts of criminal conspiracy. The State obtained the initial conspiracy indictment in this case on March 21, 2000. Mercier was reindicted on December 19, 2001. Then, on December 21, 2001, after obtaining the second indictment, the State dismissed the first indictment against Mercier. The first indictment alleged two counts of conspiracy to commit barratry under Texas Penal Code section 38.12(a) and (b).[6] *See* TEX. PEN.CODE ANN. § 38.12(a), (b) (Vernon 2003). The second indictment alleged the same two counts. Mercier pleaded not guilty on all counts. The case proceeded

---

1. The cause number below is CR–3680–01–F, styled *State of Texas v. Eugene X. Mercier.*

2. TEX.CODE CRIM. PROC. ANN. art. 44.01(a)(1) (Vernon Supp.2004–05).

3. Mercier's cross-points are presented by alphabet. For ease of reference, we use the numerical counterpart.

4. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

5. *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

6. The indictment alleges that Mercier:

[O]n or about the 30th day of September A.D., 1997, and before the presentment of this indictment, in Hidalgo County, Texas, with intent that a felony, to-wit: barratry be committed, did then and there agree with

Kent Plambeck that they would engage in conduct that would constitute said offense, and the said Kent Plambeck did perform [an] overt act in pursuance to said agreement, to-wit: pay, give, offer to pay, and give Charles Mora money to solicit employment from auto accident victims for legal representation by Eugene Mercier;

[O]n or about the 30th day of September A.D., 1997, and before the presentment of this indictment, in Hidalgo County, Texas, with intent that a felony, to-wit: barratry be committed, did then and there agree with Kent Plambeck that they would engage in conduct that would constitute said offense, and the said Eugene Mercier did perform an overt act in pursuance to said agreement, to-wit: offer to pay, and give Charles Mora money to solicit employment from auto accident victims for legal representation by Eugene Mercier[.]

to trial in the 332nd district court of Hidalgo County. On April 11, 2002, the trial court denied Mercier's motion to dismiss which was submitted as an application for writ of habeas corpus based on the statute of limitations. On April 18, 2002, the jury found Mercier guilty of one count of criminal conspiracy.[7] The jury acquitted Mercier on the remaining counts. On May 6, 2002, Mercier moved to continue sentencing to allow more time to discover *Brady* evidence.[8] The trial court heard Mercier's motion on May 7, 2002. On May 22, 2002, Mercier moved the court to clarify the prior ruling, and the trial court complied on May 29, 2002. The trial court entered an order on Mercier's motion to clarify.[9] Mercier filed a second motion to continue sentencing, asserting he required additional time to acquire, listen to, and transcribe, if necessary, audiotapes. The trial court denied the motion on the date of sentencing. On June 14, 2002, the trial court sentenced Mercier to two years in a state jail facility and immediately suspended that sentence for a term of five years' community supervision. The trial court assessed a $7,500.00 fine. On June 14, 2002, Mercier filed a notice of appeal. On the same day, he filed three post-sentencing motions.

## B. Mercier's Post–Verdict Motions Filed on June 14, 2002

### 1. Motion for New Trial–Sufficiency of the Evidence

As grounds for his motion for new trial, Mercier asserted that the evidence was

---

**7.** *See* TEX. PEN.CODE ANN. § 15.02 (Vernon 2003). Section 15.02 states:

> (a) A person commits criminal conspiracy if, with intent that a felony be committed
> (1) he agrees with one or more persons that they or one of more of them engage in conduct that would constitute the offense; and
> (2) he or one or more of them performs an overt act in pursuance of the agreement.
> (b) An agreement constituting a conspiracy may be inferred from acts of the parties.
> (c) It is no defense to prosecution for criminal conspiracy that:
> (1) one or more of the coconspirators is not criminally responsible for the object offense;
> (2) one or more of the coconspirators has been acquitted, so long as two or more coconspirators have not been acquitted;
> (3) one or more of the coconspirators has not been prosecuted or convicted, has been convicted of a different offense, or is immune from prosecution;
> (4) the actor belongs to a class of persons that by definition of the object offense is legally incapable of committing the object offense in an individual capacity; or
> (5) the object offense was actually committed.
> (d) An offense under this section is one category lower than the most serious felony that is the object of the conspiracy, and if the most serious felony that is the object of the conspiracy is a state jail felony, the offense is a Class A misdemeanor.

**8.** As grounds to continue sentencing, Mercier asserted the following: (1) contrary to its duty under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the State had not produced audiotapes; (2) that he filed a motion for discovery of exculpatory and mitigating evidence in cause number CR–0452–00, the case involving the dismissed indictment; and (3) that he needed additional time to obtain, listen to, and transcribe the tapes. Mercier requested the trial court order the State to produce the tapes. The appellate record contains a pre-trial *Brady* motion.

**9.** The trial court ordered, in part: (1) sentencing postponed; (2) the State to provide to the defense all evidence that may be exculpatory, mitigative, or impeaching as to (a) the alleged co-conspirator Kent Plambeck, (b) any witnesses testifying at trial or before the grand jury, and (c) any employee of Plambeck or Mercier; (3) the prosecutor to permit the defense to listen to specified audiotape recordings; and (4) defense counsel to provide the prosecutor a final transcript of each recording. The order details specifics of post-trial discovery of *Brady* material between the State and the defense.

legally and factually insufficient to support his conviction. The trial court set the hearing for July 16, 2002.

### 2. Motion in Arrest of Judgment–Statute of Limitations

As grounds for his motion, Mercier asserted the following: (1) under appellate rule 22.2(a), the indictment is subject to an exception on substantive grounds because prosecution was barred by a three-year statute of limitations;[10] (2) he preserved error by filing a pre-trial application for writ of habeas corpus which the trial court denied; and (3) the district court did not have jurisdiction because: (a) the indictment alleged an offense punishable as a misdemeanor, and (b) the offense alleged was a Class B misdemeanor.

### 3. Motion to Reduce State Jail Felony Punishment to Misdemeanor Punishment

In this motion, Mercier requested punishment for a Class A misdemeanor "after the court's considering the gravity and circumstances of the felony committed and the history, character, and rehabilitative needs of the defendant."

### 4. Motion to Set Aside Judgment and For New Sentencing Hearing

Mercier requested that the trial court order a new sentencing hearing because, in general, the suspended sentence is too lengthy.

### C. Mercier's Post–Sentencing Motions Filed on July 9, 2002

#### 1. "First" Motion for New Trial[11]

In this motion, Mercier generally asserted the evidence at trial was insufficient to sustain his conviction. In particular, Mercier requested a new trial because: (1) he did not receive a fair trial under the state and federal constitutions; (2) he was denied due process; (3) the evidence to support the conviction and sentence was legally and factually insufficient; (4) he was denied due course of law; (5) the verdict was contrary to the law; (6) the trial court misdirected the jury about the law; (7) the State and the trial court committed reversible errors at pre-trial and during trial; (8) the State did not produce *Brady* material; and (9) the indictment failed to allege a crime committed within the three-years limitations period and, thus, prosecution was barred by limitations.[12]

#### 2. "First" Motion in Arrest of Judgment

Mercier again asserted that: (1) prosecution was barred by limitations; and (2) the trial court lacked jurisdiction over a misdemeanor offense.

#### 3. First Amended Motion for New Trial Filed on July 15, 2002

In this motion, Mercier incorporated his July 9 motion for new trial.[13] As grounds, he asserted: (1) the trial court was re-

---

**10.** Texas Rule of Appellate Procedure 22.2(a) provides grounds for arrest of judgment in a criminal case. It states, in relevant part, a motion may be based on grounds that the indictment is subject to an exception on substantive grounds. *See* Tex.R.App. P. 22.2(a).

**11.** This is a misnomer. Mercier had already filed his motion for new trial.

**12.** Mercier again asserted that he did not forfeit the right to object to the defect, error,

or irregularity of form or substance in the indictment because he filed a pretrial application for writ of habeas corpus.

**13.** Mercier alleged, "Within thirty days after the date of the trial court's orally imposing sentence in open court, a defendant may, without leave of court, file one or more amended motions for new trial. *See* Tex. R.App. P. 21.4(b)."

quired to order an acquittal because the State's expert witness, Scott Rothenberg, testified as to the substantive barratry count; (2) the State withheld evidence tending to establish his innocence; and (3) the State knowingly presented false testimony at trial.

### 4. Brady Motion Filed on July 29, 2002

Mercier alleged that the State withheld additional audiotapes. By order dated July 29, 2002, the trial court granted the motion and ordered post-trial discovery of the audiotapes.

### D. The Motion for New Trial Order

After evidentiary hearings on July 18 and 19, 2002, the trial court unconditionally granted the motion for new trial expressly on legal insufficiency grounds.[14] The order acquitted Mercier. The order purported to grant a conditional dismissal of

14. The order states:

**ORDER ON MERITS OF DEFENSE'S REQUESTS FOR NEW TRIAL**

It is noted by the court that the above defendant's amended Motion for New Trial was presented to the court in open court on July 18, 2002, and that prior to that day the court had read said amended motion and its incorporated motion for new trial filed July 9, 2002.

On July 18, and 19, 2002, the court had a hearing in the above cause on each of defense's timely presented new trial requests: namely, (1) the motions for new trial filed on June 14, 2002, on July 9, 2002, and on July 15, 2002, which last motion specifically incorporated therein all of the Motion for New Trial filed on July 9, 2002. The court considered each of those three motions as being still pending and requiring dispositive timely determinations by the court. At said hearing, appearing for the State were Criminal District Attorney Rene Guerra and prosecutor ...; and appearing for the defense were defendant Eugene X. Mercier, and his counsels....

After not only taking judicial notice herein of all prior findings, hearings, proceedings and the jury trial in the above cause and its predecessor related causes numbered CR–441–00–F, CR–452–00–F, and CR–3669–01–F, and after also hearing and considering evidence, counsel's proffers, stipulations, agreements, argument and applicable law, it is ordered by the court that as to each of the above three pending requests for new trial, the following orders be and each is hereby entered.

It is ordered by this court that the defendant's motions for new trial filed on: June 14, 2002, July 9, 2002, and July 15, 2002, be and each of them same is hereby granted and an order of acquittal is hereby entered finding defendant Eugene X. Mercier not guilty of the crime charged, for after reviewing all the evidence, in the light most favorable to the jury's verdict, against the requisites of hypothetically correct jury instructions applicable herein, the court finds that the State failed to prove each and every requisite essential element of the charged offense beyond a reasonable doubt. (Emphasis original).

If a reviewing court determines that the above dispositive order is incorrect, then let it be know [sic] that this court has found and does find the determining facts and applicable law to be such that this court must enter the following order; and therefore in that event it is then now ordered by this court that the defendant's motions for new trial filed on: June 14, 2002, July 9, 2002, and July 15, 2002, **be and each of the same is hereby granted and an order dismissing the indictment and the prosecution herein is hereby entered.** (Emphasis original).

If a reviewing court determines that each of the above dispositive orders is incorrect, then let it be know [sic] that this court has found and does find the determining facts and applicable law to be such that this court must enter the following order; and therefore in that event it is now finally ordered that the defendant's motions for new trial filed on: June 14, 2002, July 9, 2002, and July 15, 2002, **be and each of the same is hereby granted and the cause will be promptly scheduled by the court for pretrial hearing and subsequent proceedings.** (Emphasis original).

Signed for entry today, August 22, 2002.
/s/ [Judge Presiding]

the indictment in the event of a future possible reversal by this Court of the motion for new trial. Finally, the order sought to grant a conditional new trial in the event of a second future possible reversal by this Court of the conditional dismissal of the indictment. The State's appeal ensued.

## II. CONDITIONAL ORDERS GRANTING FUTURE RELIEF

In its first issue, the State argues that the portions of the August 22, 2002 order purporting to conditionally dismiss the indictment in the event of a reversal on appeal and to conditionally grant a new trial in the event of a second reversal on appeal are void. The State argues that the scope of our review is limited to whether the evidence was legally sufficient to support the conviction, contained in the non-conditional part of the trial court's order. Mercier responds in his first crosspoint that the State has not invoked our jurisdiction because the notice of appeal is insufficient.

### A. Appellate Jurisdiction

Jurisdiction is fundamental and cannot be ignored. *State v. Roberts,* 940 S.W.2d 655, 657 (Tex.Crim.App.1996) (en banc). Our jurisdiction must be legally invoked. *Ex parte Caldwell,* 383 S.W.2d 587, 589 (Tex.Crim.App.1964). If not legally invoked, our power to act is as absent as if it did not exist. *Id.* When we lack jurisdiction to act, we have no power to dispose of the purported appeal in any manner other than dismissal for lack of jurisdiction. *Olivo v. State,* 918 S.W.2d 519, 523 (Tex.Crim. App.1996) (en banc).

■ This appeal is from an appealable order. *See* Tex.R.App. P. 25.2(a)(1). The State timely filed a notice of appeal. Tex.Code Crim. Proc. Ann. art. 44.01(d) (Vernon Supp.2004–05). A timely-filed notice of appeal vests a court of appeals with jurisdiction over a case. *Lopez v. State,* 18 S.W.3d 637, 639 (Tex.Crim.App.2000); *see Olivo,* 918 S.W.2d at 522. Notice of appeal is sufficient if it shows the party's desire to appeal from the judgment or other appealable order, and, if the State is the appellant, the notice complies with Code of Criminal Procedure article 44.01. *See* Tex. R.App. P. 25.2(c)(2). We have reviewed the notice of appeal and find it is sufficient. The State appeals a trial court order granting a new trial. The order also modifies a judgment. We have jurisdiction. *See* Tex.Code Crim. Proc. Ann. art. 44.01(a)(2), (3) (Vernon Supp.2004–05); *see also State v. Gutierrez,* 129 S.W.3d 113, 115 (Tex.Crim.App.2004). We overrule Mercier's first cross-point.

### B. Relevant District Court Jurisdiction

The trial court granted Mercier's amended motion for new trial. The trial court's order conditionally dismissed the indictment in the event of a reversal by this Court and conditionally granted a new trial in the event of a second reversal by this Court. The State appeals both conditional orders in its third and fourth issues. The State may appeal an order that dismisses the indictment. Tex.Code Crim. Proc. Ann. art. 44.01(a)(1) (Vernon Supp. 2004–05). By his fifth and sixth cross points, Mercier argues that the orders granting a dismissal and a new trial in the event of future appeals were proper.

■ In this State a district judge has jurisdiction over criminal matters conferred by virtue of the Texas Constitution. Tex. Const. art. V, § 5; *State ex rel. Holmes v. Denson,* 671 S.W.2d 896, 898 (Tex.Crim.App.1984) (en banc) (orig. proceeding) (citing *Garcia v. Dial,* 596 S.W.2d 524, 527–28 (Tex.Crim.App.1980)). The at-

tachment of jurisdiction in the district court conveys upon that court the power to determine all essential questions "and to do any and all things with reference thereto authorized by the Constitution and statutes, or permitted district courts under established principles of law." *Denson*, 671 S.W.2d at 898. A court's having jurisdiction "embraces everything in the case and every question arising which can be determined in the case, until it reaches its termination and the jurisdiction is thereby exhausted." *Id.*

■■■ The filing of a notice of appeal simply invokes appellate jurisdiction. *State v. Gutierrez*, 143 S.W.3d 829, 831 (Tex.App.-Corpus Christi 2004, no pet.) (citing *Hall v. State*, 698 S.W.2d 150, 152 (Tex.Crim.App.1985) (en banc)). The notice of appeal does not divest the trial court of jurisdiction to hear, consider, and rule on a timely filed motion for new trial. *Id.* The filing of the appellate record, not the notice of appeal, severs the trial court's jurisdiction to adjudicate the case. TEX. R.APP. P. 25.2(g); *see Green v. State*, 906 S.W.2d 937, 939 (Tex.Crim.App.1995) ("Once the trial record has been filed with the Court of Appeals or this Court, the trial court no longer has jurisdiction to adjudicate the case."). Texas Rule of Appellate Procedure 40(b)(2) provides that in the appeal of a criminal case, when the record has been filed in the appellate court, all further proceedings in the trial court, except as provided by law or by these rules, shall be suspended and arrested until the mandate of the appellate court is received by the trial court. TEX.R.APP. P. 40(b)(2); *see Green*, 906 S.W.2d at 939. The trial court cannot regain jurisdiction

unless and until the court of appeals returns the case to that court. *Lopez v. State*, 18 S.W.3d 637, 639 (Tex.Crim.App. 2000). It is axiomatic that where there is no jurisdiction, the power of the court to act is as absent as if it did not exist and any order entered by a court having no jurisdiction is void. *See Green*, 906 S.W.2d at 939 (citing *Dial*, 596 S.W.2d at 528).

We apply these principles to the State's first, third, and fourth issues, in the context of the trial court's plenary jurisdiction during the motion for new trial proceedings.

## C. Trial Court's Authority to Grant an Amended Motion for New Trial

■■■ In criminal cases, there is no common law right to a new trial. *Banks v. State*, 79 Tex.Crim. 508, 186 S.W. 840, 841 (1916). The right is purely statutory. *Id.*; *see Drew v. State*, 743 S.W.2d 207, 223 (Tex.Crim.App.1987) (en banc); *see also* TEX.R.APP. P. 21.2. When the State appeals from an order granting a new trial, the proper standard of appellate review is abuse of discretion. *State v. Gonzalez*, 855 S.W.2d 692, 696 (Tex.Crim.App.1993) (en banc). The trial court is granted wide latitude in exercising the decision to grant or deny a motion for new trial, and in the absence of an abuse of discretion, an appellate court should not reverse. *Lewis v. State*, 911 S.W.2d 1, 7 (Tex.Crim.App. 1995).

■■■ The time for filing motions for new trial and amended motions for new trial in criminal cases is presently governed by Texas Rule of Appellate Procedure 21.4. *See* TEX.R.APP. P. 21.4.[15] To

---

15. Rule 21.4 states:

(a) *To File:* The defendant may file a motion for new trial before, but no later than 30 days after, the date when the trial court imposes or suspends sentence in open court.

(b) *To Amend:* Within 30 days after the date when the trial court imposes or suspends sentence in open court but before the

construe a rule of appellate procedure, we apply the rules of statutory construction. *See State v. Hardy*, 963 S.W.2d 516, 519 (Tex.Crim.App.1997) (en banc). Under ordinary statutory construction, we apply the plain meaning of the words contained in the rule unless such application would lead to an absurd result. *Id.* The rule does not authorize an amendment of a motion after the thirty days have expired. Accordingly, no amended motion for new trial may be filed after the thirty-day period, even with leave of court. *Id.; see also Drew*, 743 S.W.2d at 222–23 (construing former rule).

■ In this case, Mercier amended his motion for new trial twice. The trial court expressly considered the documents filed on June 14, 2002, July 9, and July 15, 2002. The motion for new trial and one or more amended motions were timely filed. *See* Tex.R.App. P. 21.4. The motions were properly before the trial court. The trial court was within its statutory authority to grant relief based on the record before it. We turn to the State's argument that the trial court had no authority to grant conditional relief.

### D. Future Relief

■ Granting a motion for new trial restores the case to its position before the former trial, including, at any party's option, arraignment or pretrial proceedings initiated by that party. Tex.R.App. P. 21.9. The prior conviction must not be regarded as a presumption of guilt, nor may it be alluded to in the presence of the jury that hears the case on retrial. *Id.* The granting of a motion for new trial is the equivalent of an acquittal. *Rodriguez v. State*, 852 S.W.2d 516, 519 (Tex.Crim.App.1993) (en banc) (stating trial court no longer had

jurisdiction over case after granting motion for new trial on insufficient evidence ground because granting the motion for new trial was equivalent of acquittal) (citing *Moore v. State*, 749 S.W.2d 54, 58 (Tex.Crim.App.1988) (en banc), *overruled on other grounds Awadelkariem v. State*, 974 S.W.2d 721, 728 (Tex.Crim.App.1998)).

### E. Disposition

■ In this case, the trial court granted the motion on legal sufficiency grounds and entered an acquittal. When a trial court grants a motion for new trial based solely on legal insufficiency of the evidence, the only further action permitted by the Double Jeopardy Clause is an entry of a judgment of acquittal. *See Smith v. State*, 15 S.W.3d 294, 301 n. 3 (Tex.App.-Dallas 2000, no pet.); *see also Gollihar v. State*, 46 S.W.3d 243, 247 n. 4 (Tex.Crim. App.2001). Nothing in rule 21.9 addresses the trial court's authority or lack of authority to grant relief in the event of future appeals. We conclude that the trial court's orders granting relief as to future appeals are advisory and of no legal effect. *See* Tex.R.App. P. 21.9; *see Hardy*, 963 S.W.2d at 519. We sustain the State's first issue.

■ In its third and fourth issues, the State challenges the trial court's conditional orders. We have already concluded that the trial court's conditional orders are advisory and of no legal effect. Whether the parties will file further appeals remains hypothetical. Accordingly, we do not express any opinion on the question of the trial court's orders conditioned on further appeals. We are without authority to render advisory opinions. *Armstrong v.*

court overrules any preceding motion for new trial, a defendant may, without leave of court, file one or more amended motions for new trial.

Tex.R.App. P. 21.4.

*State*, 805 S.W.2d 791, 794 (Tex.Crim.App. 1991); *Hargrove v. State*, 774 S.W.2d 771, 773 (Tex.App.-Corpus Christi 1989, pet. ref'd). Thus, we do not reach the State's third and fourth issues and Mercier's fifth and sixth cross-points. *See* TEX.R.APP. P. 47.1

Because the trial court granted relief expressly on grounds of legal insufficiency, we turn to the merits of the State's second issue. TEX.CODE CRIM. PROC. ANN. art. 44.01(2), (3) (Vernon Supp.2004–05). By his second cross-point, Mercier argues that the State failed to preserve error by not contesting all implied findings and conclusions of law supporting the order of acquittal.

### III. LEGAL SUFFICIENCY OF THE EVIDENCE

By its second issue, the State argues that the evidence was legally sufficient to sustain the conviction. By his fourth cross-point, Mercier asserts legal insufficiency of the evidence. Because a legal sufficiency challenge, if sustained, results in an acquittal rather than a retrial, we must consider the issue. *See Clewis v. State*, 922 S.W.2d 126, 132 (Tex.Crim.App. 1996) (en banc).

#### A. Scope and Standard of Review– Motion for New Trial

We review the granting of a motion for new trial under an abuse of discretion standard. *See Lewis*, 911 S.W.2d at 7. An abuse of discretion occurs when the trial court's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree. *Cantu v. State*, 842 S.W.2d 667, 682 (Tex.Crim. App.1992) (en banc). An abuse of discretion occurs when the trial court acts arbitrarily or unreasonably, without reference to guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex.

Crim.App.1990) (en banc). We may not substitute our judgment for that of the trial court. *Cantu*, 842 S.W.2d at 682. Instead, we must decide whether the trial court's decision was arbitrary or unreasonable. *Id.; Gonzalez*, 855 S.W.2d at 696. The credibility of the witnesses is primarily a determination for the trial court. *Hoyos v. State*, 951 S.W.2d 503, 511 (Tex. App.-Houston [14th Dist.] 1997), *aff'd*, 982 S.W.2d 419 (Tex.Crim.App.1998). As finder of fact, the trial judge may accept or reject any part or all of the testimony given by State or defense witnesses. *Johnson v. State*, 571 S.W.2d 170, 173 (Tex. Crim.App. [Panel Op.] 1978); *see also Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim. App.1997) (en banc). Thus, we are authorized to: (1) apply a deferential standard of review to the trial court's resolution of historical facts; and (2) may rely upon implied findings of fact that are supported by the record to uphold the trial court's ruling, even when the trial court is not faced with expressly conflicting affidavits or testimony. *Charles v. State*, 146 S.W.3d 204, 206 (Tex.Crim.App.2004).

Even so, in ruling on a motion for new trial based upon legal insufficiency of the evidence, the trial court must use the same standard of review as that used by appellate courts, as set forth below. *See State v. Savage*, 905 S.W.2d 272, 274 (Tex.App.-San Antonio 1995), *aff'd*, 933 S.W.2d 497 (Tex.Crim.App.1996). The trial court must decide, after reviewing the evidence in the light most favorable to the verdict, whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Id.* When a motion for new trial challenges the sufficiency of the evidence to support a jury's finding, the trial court cannot weigh the evidence and judge the credibility of the witnesses. *State v. Charlton*, 847 S.W.2d 443, 446 (Tex.App.-Houston [1st

Dist.] 1993, no pet.). The grant of a new trial on the basis of legally insufficient evidence is equivalent to an acquittal. *See Rodriguez v. State,* 852 S.W.2d 516, 519 (Tex.Crim.App.1993) (en banc). The defendant ordinarily has the burden of proof on a motion for new trial. *See Patrick v. State,* 906 S.W.2d 481, 498 (Tex.Crim.App. 1995) (en banc). Whether the trial court abused its discretion depends on the facts of each case. *See Love v. State,* 861 S.W.2d 899, 903 (Tex.Crim.App.1993) (en banc).

### B.  Standard of Review– Legal Sufficiency of the Evidence

■ In measuring legal sufficiency in the context of a motion for new trial, the trial court is bound by appellate legal sufficiency standards of review. *See Savage,* 905 S.W.2d at 274. A legal-sufficiency challenge calls for appellate review of the relevant evidence in the light most favorable to the prosecution. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Swearingen v. State,* 101 S.W.3d 89, 95 (Tex.Crim.App.2003) (en banc); *Johnson v. State,* 23 S.W.3d 1, 7 (Tex.Crim.App.2000) (en banc). We consider all the evidence that sustains the conviction, whether properly or improperly admitted or whether introduced by the prosecution or the defense, in determining the legal sufficiency of the evidence. *Conner v. State,* 67 S.W.3d 192, 197 (Tex.Crim. App.2001).

■ We measure the legal sufficiency of the evidence in this case against the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State,* 953 S.W.2d 234, 240 (Tex.Crim. App.1997). A hypothetically correct jury charge is one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's bur-

den of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.* A hypothetically correct jury charge would not simply quote from the controlling statute. *Gollihar,* 46 S.W.3d at 254. Its scope is limited by "the statutory elements of the offense ... as modified by the charging instrument." *Fuller v. State,* 73 S.W.3d 250, 254 (Tex.Crim.App.2002) (en banc) (Keller, P.J., concurring) (quoting *Curry v. State,* 30 S.W.3d 394, 404 (Tex.Crim.App.2000)).

■ When a statute lists more than one method of committing an offense, and the indictment alleges some, but not all, of the statutorily listed methods, the State is limited to the methods alleged. *Fuller,* 73 S.W.3d at 255; *Curry,* 30 S.W.3d at 404. This standard of legal sufficiency ensures that a judgment of acquittal is reserved for those situations in which there is an actual failure in the State's proof of the crime. *Malik,* 953 S.W.2d at 240. We then determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781; *Johnson,* 23 S.W.3d at 7. We are required to provide a remedy tantamount to an appellate acquittal only when we determine that the evidence is insufficient to support a conviction due to a failure of proof at trial with respect to the guilt or innocence of the defendant. *See Fuller,* 73 S.W.3d at 253 (citing *Burks v. United States,* 437 U.S. 1, 15–18, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978)); *see also Moff v. State,* 131 S.W.3d 485, 489 (Tex.Crim.App.2004).

■ In performing a legal-sufficiency review, we are mindful that the fact finder is the exclusive judge of the credibility of witnesses and the weight to be given testimony. TEX.CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Adelman v. State,* 828 S.W.2d 418, 423 (Tex.Crim.App.1992)

(en banc); *Butts v. State,* 835 S.W.2d 147, 151 (Tex.App.-Corpus Christi 1992, pet. ref'd). The fact finder may believe some witnesses and refuse to believe others. *Esquivel v. State,* 506 S.W.2d 613, 615 (Tex.Crim.App.1974). It also may accept portions of a witness's testimony and reject others. *Id.; Butts,* 835 S.W.2d at 151.

### C. General Verdict

■ When the indictment alleges alternate theories of committing the same offense, it is proper for the jury to be charged in the disjunctive and to return a general verdict of guilty. *Kitchens v. State,* 823 S.W.2d 256, 258 (Tex.Crim.App. 1991) (en banc); TEX.CODE CRIM. PROC. ANN. art. 37.07, § 1(a) (Vernon Supp.2004–05) (verdict must be general). The conviction will be upheld if the evidence is sufficient to support a finding of guilt under any one of the theories submitted. *Fuller v. State,* 827 S.W.2d 919, 931 (Tex.Crim.App.1992) (en banc); *Kitchens,* 823 S.W.2d at 258; *see Aguirre v. State,* 732 S.W.2d 320, 326 (Tex.Crim.App.1987) (en banc); *Yandell v. State,* 46 S.W.3d 357, 363 (Tex.App.-Austin 2001, pet. ref'd).

### D. The Hypothetically Correct Jury Charge

#### 1. The Elements of Conspiracy to Commit Barratry

■ The indictment charged Mercier with barratry and conspiracy to commit barratry. TEX. PEN.CODE ANN. § 38.12(a), (b) (Vernon 2003); TEX. PEN.CODE ANN. § 15.02(a) (Vernon 2003). The jury was charged on one count of conspiracy.[16] The charge included an instruction on barratry.[17] By general verdict, the jury convicted Mercier for the offense of conspiracy to commit barratry. The elements of the offense of criminal conspiracy are: (1) a person, (2) with intent that a felony be committed, (3) agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense, and (4) he or one or more of them performs an overt act in pursuance of the agreement. TEX. PEN.CODE ANN. § 15.02(a) (Vernon 2003). The elements of the underlying felony offense of barratry are as follows: (1) a person, (2) with intent to obtain an economic benefit,[18] (3) engages in unlawful conduct.[19] TEX. PEN.

---

16. The charge states:

Our law provides that a person commits the offense of criminal conspiracy, if, with intent that a felony be committed, (1) he agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense; and (2) he or one or more of them performs an overt act in pursuance of the agreement.

An "overt act" is any act knowingly committed by one of the conspirators in an effort to effect or accomplish some object or purpose of the conspiracy. The overt act need not be criminal in nature if considered separately and apart from the conspiracy. It must, however, be an act which follows and tends toward accomplishment of the plan or scheme and must be knowingly done in furtherance of some object or purpose of the conspiracy.

17. The charge states:

You are further instructed that a person commits the felony offense of Barratry if the person, with the intent to obtain an economic benefit,

    A. pays or gives or offers to pay or to give another person money to solicit employment.

18. "Economic benefit" means anything reasonably regarded as an economic gain or advantage, including accepting or offering to accept employment for a fee, accepting or offering to accept a fee, entering into a fee contract, or accepting or agreeing to accept money or anything of value. TEX. PEN CODE ANN. § 38.01(3) (Vernon 2003).

19. Section 38.12 provides:

(a) A person commits an offense if, with intent to obtain an economic benefit the person:

CODE ANN. § 38.12(a) (Vernon 2003). The plain language of this statute demonstrates that the legislature intended to criminalize various forms of solicitation of prospective legal clients by attorneys or their representatives. *State v. Mays*, 967 S.W.2d 404, 408 (Tex.Crim.App.1998) (en banc).

■ Thus, a hypothetically correct jury charge would instruct the jury that they could find Mercier guilty of criminal conspiracy if: (1) he, (2) with the intent to obtain an economic benefit, (3) agreed with one or more persons, (4) to pay or give or offer to pay or give a person money or anything of value to solicit employment, and (5) one or more of them committed an overt act. *See* TEX. PEN.CODE ANN. § 38.12(a)(4) (Vernon 2003); *see also Lopez v. State*, 846 S.W.2d 90, 92–93 (Tex. App.-Corpus Christi 1992, pet. ref'd).

■ An agreement constituting a conspiracy may be inferred from the acts of the parties. *See* TEX. PEN.CODE ANN. § 15.02(b) (Vernon 2003). The essential element of criminal conspiracy is an agreement to commit a crime. *Cuellar v. State*, 13 S.W.3d 449, 453 (Tex.App.-Corpus Christi 2000, no pet.) (citing *Williams v. State*, 646 S.W.2d 221, 222 (Tex.Crim.App. 1983)). Because conspirators' work is often done in secrecy and under cover, direct evidence is not required to support a conviction for criminal conspiracy; circumstantial evidence will suffice. *Id.*

### 2. The Statutory Exception

■ It is an exception to prosecution that the person's conduct is authorized by the Texas Disciplinary Rules of Professional Conduct or any rule of court. TEX. PEN.CODE ANN. § 38.12(c) (Vernon 2003). The general rule is that where a penal statute embraces an exception which is part of the statute itself, the State must negate the exception in the indictment. *Lopez*, 846 S.W.2d at 93.

### D. Standards and Scope of Review– The Accomplice Witness Rule

■ A conviction may not be based on the testimony of an accomplice witness unless the accomplice's testimony is corroborated by other evidence tending to connect the accused to the offense. TEX. CODE CRIM. PROC. ANN. art. 38.14 (Vernon 1979); *Vasquez v. State*, 67 S.W.3d 229, 236 (Tex.Crim.App.2002) (citing *Cathey v. State*, 992 S.W.2d 460, 462–63 (Tex.Crim. App.1999), *cert. denied*, 528 U.S. 1082, 120 S.Ct. 805, 145 L.Ed.2d 678 (2000)). The evidence is insufficient if it proves merely the commission of the offense. *Cathey*, 992 S.W.2d at 462. It is not necessary

---

(1) knowingly institutes a suit or claim that the person has not been authorized to pursue;
(2) solicits employment, either in person or by telephone, for himself or for another;
(3) pays, gives, or advances or offers to pay, give, or advance to a prospective client money or anything of value to obtain employment as a professional from the prospective client;
(4) pays or gives or offers to pay or give a person money or anything of value to solicit employment;
(5) pays or gives or offers to pay or give a family member of a prospective client money or anything of value to solicit employment; or

(6) accepts or agrees to accept money or anything of value to solicit employment.
(b) A person commits an offense if the person:
(1) knowingly finances the commission of an offense under Subsection (a);
(2) invests funds the person knows or believes are intended to further the commission of an offense under Subsection (a); or
(3) is a professional who knowingly accepts employment within the scope of the person's license, registration, or certification that results from the solicitation of employment in violation of Subsection (a).
TEX. PEN.CODE ANN. § 38.12 (Vernon 2003).

that the corroborating evidence directly connect the defendant to the crime or that it be sufficient by itself to establish guilt; it need only tend to connect the defendant to the offense. *Id.; Vasquez*, 67 S.W.3d at 236; *Hernandez v. State*, 939 S.W.2d 173, 176 (Tex.Crim.App.1997) (en banc). If the combined weight of the non-accomplice evidence tends to connect the defendant to the offense, the requirement of article 38.14 has been fulfilled. *Cathey*, 992 S.W.2d at 462; *Reed v. State*, 744 S.W.2d 112, 126 (Tex.Crim.App.1988) (en banc).

■ To determine whether an accomplice's testimony is sufficiently corroborated, we eliminate from consideration the testimony of the accomplice witness and examine the remaining evidence to ascertain whether there is evidence that tends to connect the accused to the offense. *Hernandez v. State*, 939 S.W.2d 173, 176 (Tex.Crim.App.1997) (en banc). We must view the corroborating evidence in the light most favorable to the finding of guilt. *Cantelon v. State*, 85 S.W.3d 457, 461 (Tex. App.-Austin 2002, no pet.).

### E. The Evidence

#### 1. Exception to Prosecution

■ The State's expert, Scott Rothenberg, testified that the Texas Disciplinary Rules of Professional Conduct prohibit an attorney to pay a non-attorney for economic benefits where the non-attorney referred cases to the attorney, namely, in exchange for soliciting auto accident victims. According to Rothenberg, the conduct violated rules 7.03(b) and (c) of the Disciplinary Rules. We conclude that the State negated the exception within the statute. *See* TEX. PEN.CODE ANN. § 38.12(c) (Vernon 2003); *Lopez*, 846 S.W.2d at 93.

#### 2. Accomplice Evidence

The defense argued during the motion for new trial hearing that the State's witness, Angelica Rhodes, was "not an accomplice witness" and that Charlie Mora was the only accomplice, based on the evidence at trial.[20] The court's charge instructed the jury that Mora was an accomplice. The court's charge contained, generally, accomplice instructions. The defense argued that *Brady* evidence disclosed posttrial showed Rhodes was also an accomplice.

■ An accomplice is a person who participates in an offense before, during, or after its commission to the extent that the person can be charged with the offense or with a lesser offense. *Herron v. State*, 86 S.W.3d 621, 631 (Tex.Crim.App.2002) (en banc) (citing *Blake v. State*, 971 S.W.2d 451, 454–55 (Tex.Crim.App.1998) (en banc)). An accomplice acts with the required culpable mental state. *See Paredes v. State*, 129 S.W.3d 530, 536 (Tex.Crim. App.2004). The participation must involve an affirmative act that promoted the commission of the offense with which the accused is charged. *Id.* An accomplice as a matter of law is one who is susceptible to prosecution for the offense with which the accused is charged or a lesser-included offense. *Id.*

■ A person is an accomplice if there is sufficient evidence connecting him or her to the criminal offense as a blameworthy participant. *See Blake*, 971 S.W.2d at 455. "[T]he test is whether or not there is sufficient evidence in the record to support a charge against" the witness alleged to be an accomplice. *Id.* To determine whether the witness was an accomplice, we

---

**20.** The argument was made in the context of the defense's asserted harm by claimed *Brady* violations.

examine the record for evidence of the participation in the crime. *See id.* Whether the person is actually charged and prosecuted for their participation is irrelevant to the determination of accomplice status-what matters is the evidence in the record. *Id.* At trial, Rhodes recanted material testimony she provided to the grand jury. She admitted she lied to the grand jury. Nonetheless, viewed in the light most favorable to the verdict under the *Jackson* standard of review, the evidence at trial showed that, in September 1997, Rhodes attended a meeting between Mercier and Kent Plambeck in Mercier's law office.[21] At the time, Rhodes worked at Mercier's law office as a paralegal. Previously, Rhodes had worked with Plambeck in his chiropractic office. According to Rhodes, the meeting was called because Mercier needed to make payment on some auto accident personal injury files. Plambeck and Mercier discussed a plan in which Plambeck would refer clients to Mercier. In exchange, Mercier was to pay one hundred percent of the medical expenses for injured patients Plambeck treated, who were also Mercier's clients. According to Rhodes, the agreement between Plambeck and Mercier was to obtain clients. Rhodes testified that Plambeck was frustrated that, in general, personal injury attorneys requested a percentage reduction of his bill, and Plambeck wanted full payment in personal injury cases. Rhodes testified that, as part of personal injury practice, a medical narrative report was generated to assist attorneys in the settlement of the claims with insurance companies. The usual fee for a narrative was $200 to $250. Mercier agreed to pay

$50 for the report; however, in reality, the fee was payment toward the $500 fee per client charged by a "telemarketer" of clients, Charlie Mora. According to Rhodes, Plambeck would pay the $450 balance of Mora's fee.

According to Rhodes, the agreement and operation in place was (1) Charlie Mora, a "telemarketer," would meet persons involved in motor vehicle accidents at a body shop, generally, to provide one of three property damage estimates required by insurance companies;[22] (2) the offer to estimate the cost of repair was to get the person to go to the doctor or an attorney; (3) Mora would provide the potential client the "800 number" to Mercier's law office, or a cell phone number, or call the office directly and allow the potential client to speak to Rhodes; (3) Rhodes would visit the caller in person and, as Mercier required, ask, "Are you asking for our services ?"; (4) she would have the person execute a contract, intake sheet, and a form confirming the person was asking for the services; (5) she would set up the client's appointment with Plambeck's office; (6) Mora's work yielded ten to twenty new clients daily; and (7) Mercier would pay the $50 out of settlement funds. Rhodes further testified that Mercier's agreement with Mora to refer clients occurred by telephone but Plambeck and Mercier met with Mora on several occasions. She heard Mercier tell Mora that the body shop should pay him as a representative of the body shop in case of an investigation. Mercier instructed Mora regarding the manner by which to approach potential clients. Mora trained his

---

21. For disposition of the charges against Plambeck, *see Plambeck v. State*, No. 13–02–492–CR and 13–02–493–CR, 2004 Tex.App. LEXIS 10818 (Tex.App.-Corpus Christi, December 2, 2004, pet. filed).

22. According to Rhodes, Plambeck's employee, Doug Friedman, conceived an idea to involve a body shop in securing client/patient referrals, and the two involved Mercier. Mora obtained traffic accident reports and called laborers or blue-collar workers.

workers to refer injured persons to Mercier.

Viewed through the prism of the abuse of discretion standard required in the context of a new trial, we conclude that the trial court could have reasonably concluded that Rhodes was an accomplice witness and that conclusion was within the zone of reasonable disagreement. *See Blake*, 971 S.W.2d at 455; *see Cantu*, 842 S.W.2d. at 682. Under the accomplice witness rule, Rhodes' testimony required corroboration. *See* TEX.CODE CRIM. PROC. ANN. art. 38.14 (Vernon 1979); *Vasquez*, 67 S.W.3d at 236. Thus, the hypothetically correct jury charge would have instructed the jury that Rhodes, like Mora, was an accomplice witness.[23] *Malik*, 953 S.W.2d at 240.

Before we review the non-accomplice testimony, we pause to consider Mora's evidence at trial.[24] Charles Mora testified he formerly owned Accident Care. He had an office at Plambeck's clinic and at a body shop. He hired contract workers to market for patients. Mora obtained the names of contacts from police reports. His workers contacted persons involved in accidents to tell them they could receive a free consultation at the clinic. Mora testified that Plambeck introduced him to Mercier. He met with Mercier and discussed procedures "on how to approach the people on the phone, and how to sign them up as in ... how to get them to the body shop, and how to get them to say that they wanted legal assistance." In 1997, Plambeck paid Mora $300 for each patient referred. In turn, Mora paid the worker making the referral $100. In September 1997, after Mora began working out of the

body shop, he was paid $500 per person referred. His objective in contacting vehicular accident victims was to "get them to talk to an attorney—so they could go to the doctor so they can get paid." The attorney, in particular, was Mercier.

Mora further testified on the State's direct examination:

Q. Whose idea was it for you to go out and give estimates for vehicles?

A. Whose idea was it?

Q. Yes.

A. Dr. Plambeck.

Q. And whose idea was it for you to move to Auto Kolors? Was that your own or Dr. Plambecks?

A. I had an office in three different locations. I had one at the doctor's, the Body Shop.... It was more convenient for us whichever we were closer to....

Q. [W]hen you were being paid for this $500 per client ... where were the checks coming from?

A. Different locations. I had—I don't remember the names. I know Dr. Plambeck was paying me.

Q. Okay. Anybody else that was paying you that you remember?

A. No, not necessarily.

Q. When they were paying you, were they making checks payable to you personally or payable to any of your companies?

A. Well, I had different companies.

Q. And what companies did you have? . . .

---

23. The record shows both Mora and Rhodes were granted immunity for purposes of their grand jury testimony. The charge instructed the jury that Mora was an accomplice witness and on accomplice testimony generally.

24. Mora invoked his Fifth Amendment right and, when ordered to testify in part based on immunity, he acknowledged the testimony he gave to the grand jury without committing to its veracity. This occurred primarily during questioning regarding whether Mercier paid for his referral services.

A. ... Accident Care Services ... Independent Estimates ... CMS Construction Company....

Mora testified that the money paid through these companies was for his referral services. He further testified:

Q. Did he—was Mr. Mercier supposed to pay you for any of the clients that you referred?

A. I don't know if he was supposed to, I said, the first time. It wasn't like he was supposed to pay me. It was never meant to be like that ...

Q. Did Mr. Mercier pay you any money for the referrals of the clients?

A. He gave me some money, yes, ma'am.

Q. And how much was that?

A. It was $4,000....

Finally, Mora testified he met with Mercier. Mora acknowledged his grand jury testimony that the money from Mercier was for clients referred to Mercier and Mercier was to pay $100 per person referred to him.[25]

Mindful that we must view the corroborating evidence in the light most favorable to the finding of guilt, we turn to the testimony of non-accomplice witnesses. *Cantelon,* 85 S.W.3d at 461.

### 3. Non-accomplice Evidence

#### a. Former Clients

The State called numerous former clients of Mercier. Collectively, the testimony of the witnesses showed: (1) involvement in vehicular accidents; (2) uninvited contact from one or more persons by telephone or at home; (3) within a few days of the accident (a) offering free estimates for property damage, (b) offering free consultations with an attorney, Mercier, (c) offer-ing free initial consultation for injuries through Plambeck's clinic; (4) signing two documents at Mercier's law office; (5) employing Mercier but contacting primarily his staff; and (6) settling their personal injury claims. Uniformly, the witnesses testified the visiting individuals told them they obtained names and addresses from police department vehicular accident reports. As we must, we have reviewed all the evidence at trial, whether properly or improperly admitted, in the light most favorable to the verdict. *See Moff,* 131 S.W.3d at 492. We pause to note some of the former clients' testimony before the jury.

Araceli Cantu testified she was involved in a vehicular accident on August 11, 1998. Two men and a woman approached her daughter at the hospital while Cantu was there in a coma after the accident. One man was named "Carlos" and the woman was "Angie." Her family did not call Carlos or Angie to visit the hospital. Her daughter had "accepted" Mercier to handle Cantu's claim. While recovering in the hospital, Cantu signed two documents admitted in evidence. In one, she acknowledged she requested a free consultation with Mercier's office. The form continues, "I was referred over to this office by representatives of the body shop or a car rental agency. I never discussed any attorneys with a telemarketer." After Cantu was released, she was referred to Plambeck's clinic. She assumed Mercier's office made the referral. Mercier's office settled her case.

Omar Garza testified he was involved in a vehicular accident in 1998. Two men visited his home to provide an estimate on his truck, representing they were from a body shop. Garza did not call them. He

---

**25.** Mora later testified that he told the grand jury what they wanted to hear and gave the $4,000 figure as an amount that came to his head.

did not ask them for an attorney. The two men did not provide an estimate. They referred him to Mercier's office. Once there, he was referred to Plambeck's clinic. He signed the form admitted in evidence stating, "I request a free consultation with the law office" of Mercier. He signed another document, admitted in evidence stating, "I request a free consultation with the law office of Eugene Mercier. I was referred over to the office by a representative of a body shop or a car rental agency. I never discussed any attorneys with a telemarketer." Mercier's office settled his case.

Esmeralda Fuentes testified that she was involved in a car accident in 1998. An adjuster named "Vicente" contacted her home. Once there, he called "Angie" who worked at Mercier's office. Fuentes already had an attorney. At Angie's suggestion that the attorney was not reputable, Fuentes completed a release form to release the attorney and hired Mercier. She was referred to Plambeck's office.

Carlos Garcia testified he was involved in a car accident and, the next day, Rhodes contacted him and identified herself as Mercier's legal assistant. He did not request the visit. She arrived unexpectedly and had forms that he signed. Garcia went to Mercier's office and was referred to Plambeck's clinic. He signed the forms containing the free consultation and referral information. A man named Joe Garcia from a body shop picked up his vehicle for repair but did not repair it-another body shop did. Mercier's office settled his case.

Alonso De Leon testified that he was involved in a vehicular accident in 1998. A man from a body shop called him the following day and told him he could get his truck fixed without a problem. The caller told him he knew a lawyer who could help De Leon. They met the next day at Merci-er's office. Another man provided "Raul" from Mercier's office an estimate of the vehicle completed at the office. "Raul" explained he obtained De Leon's name from the police report. De Leon was referred to Plambeck's clinic. At "Raul's" request, De Leon signed the two forms regarding the free consultation and referral information. De Leon's vehicle was not repaired. His case was settled.

Numerous witnesses testified similarly. Another witness, Stacie Palmer, testified that she managed Plambeck's accounts in 1998. She recalled writing several checks in payment to Mora and to his wife. Sergeant Israel Pacheco, with the Texas Rangers, testified that he began investigating Mercier and Plambeck in 1998. He testified that Rhodes was arrested for bribing one of the Department of Public Services secretaries in Harlingen by paying the secretary money for copies of accident reports.

### 2. Former Employees

Raul Ortiz testified he previously worked with Mercier. He knew of one meeting lasting about two hours between Mercier and Plambeck. Rhodes was present at the meeting. Rhodes called Ortiz into the office where the meeting took place because Mercier and Plambeck were in an altercation. When Ortiz entered, he noticed Plambeck looked upset and observed Mercier fixing his tie. Ortiz, like Rhodes, signed up clients daily. Mora referred some clients directly and others called the firm's toll-free telephone number. In 1998, most of the referrals were from Mora and many of the firm's referrals were to Plambeck's clinic. Ortiz saw Mora visit the law office about twice a week. Ortiz had instructions to further refer Mora's referrals to Plambeck's clin-

ic.[26]

Armando Valdez testified he worked for Mora in 1997, telemarketing for clinics at Mora's business, Accident Care. Valdez described his duties as calling persons involved in auto accidents to ask if they wanted a no-cost check-up at the clinic. Mora made the decision as to whom to call. The insurance of the party at fault would be billed. Eventually, Mora's business moved to a body shop. There, Valdez contacted persons identified in police accident reports about providing a free estimate for property damage. While at the contact's home, Valdez would refer them to an attorney if they wanted one. The referrals were mainly to Mercier. Valdez made the call to Mercier's office, either asking for Rhodes or dialing the toll-free number. Sometimes Valdez provided transportation to the office. Mora made the decision to refer the persons contacted to Mercier. According to Valdez, from "there they would be sent to the clinic and if they needed treatment, we would get paid from the clinic." The clinic involved was Plambeck's clinic. Plambeck paid Mora, and Mora paid Valdez by check at the rate of one hundred dollars per person referred when the person visited the clinic three times.[27] Mora kept a list of the persons referred. Valdez referred approximately fifteen persons every two weeks to Mercier's office.

Carlos Herrera testified he formerly worked for Mora in 1997 at Accident Care. While there, he "telemarketed auto accident victims." Mora gave him a list and told him to call the persons. Mora obtained accident reports from the police department. Mora paid him $75 per person and then later $100 per person he

contacted who received treatment at a clinic. The "doctor" paid Mora. Herrera referred approximately twenty people a month. When the office moved to the body shop, he called persons involved in accidents to provide free property damage estimates. He referred persons to Mercier when they needed assistance securing a rental vehicle.

### F.  Disposition

The trial court order set aside the jury verdict of guilty, granted Mercier's motion for new trial, and entered an acquittal based on legal insufficiency of the evidence, a ground squarely before it. We must decide whether the trial court's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree. *Cantu*, 842 S.W.2d at 682.

The trial court was present when the witnesses testified and the evidence presented. In material parts, Rhodes' testimony at trial differed from her testimony before the grand jury, and she admitted she lied during the grand jury proceeding. Similarly, Mora's testimony was deferential to his grand jury testimony but noncommittal to its veracity. In the light most favorable to the verdict, the evidence showed that a system was in place to target vehicular accident victims, contact them unannounced and uninvited, refer them to Mercier's law office, from there refer them to Plambeck's clinic, and secure settlement of personal injury claims. According to Rhodes, Mercier and Plambeck agreed that Mercier would pay $50 toward Mora's $500 fee. According to Mora, Plambeck paid him through Mora's three different business entities for obtaining patients.

---

26. The record does not establish the source of the instruction.

27. At one point, Valdez testified that Plambeck paid him and provided an IRS form 1099 but then stated he did not recall whether Plambeck paid him directly or not.

We are mindful that the essential element of criminal conspiracy in this case was an agreement to commit barratry. *See Cuellar,* 13 S.W.3d at 453. Because conspirators' work is often done in secrecy and under cover, direct evidence is not required to support a conviction for criminal conspiracy; circumstantial evidence will suffice. *Id.* At trial, Mora acknowledged his grand jury testimony that Mercier paid him $4,000 for referring clients. Mora declined to testify as to the truth of the testimony. Because he was an accomplice, Mora's testimony required corroboration. *Cathey,* 992 S.W.2d at 462. Rhodes testified that Mercier agreed with Plambeck to pay $50 toward Mora's fee. Because a hypothetically correct jury charge would have instructed the jury that Rhodes was an accomplice witness, her testimony also required corroboration. *Id.; Malik,* 953 S.W.2d at 240. A reasonable inference is that the trial court had reason to doubt Mora's and Rhodes' credibility. *See Charles,* 146 S.W.3d at 206; *see also Johnson,* 571 S.W.2d at 173; *Esquivel,* 506 S.W.2d at 615. We must defer to the trial court's resolution of historical facts. *Charles,* 146 S.W.3d at 206.

Ruling on a motion for new trial based upon legal insufficiency of the evidence required the trial court to use the same standard of review as that used by appellate courts. *See Savage,* 905 S.W.2d at 274; *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781. Viewed in the light most favorable to the verdict, evidence adduced by non-accomplice witnesses establishes that they signed documents requesting Mercier's legal services and identifying a referral source. The witnesses did not initiate the contact they had with persons from Mercier's law office offering post-accident services. Once contacted, the witnesses hired Mercier to represent them and were referred to Plambeck's clinic. Some of the witnesses identified Rhodes by name.

Mercier's former employee Ortiz testified that: (1) Mora visited the law office about twice a week; (2) in 1998, most of the referrals were from Mora and to Plambeck; and (3) Ortiz had instructions to further refer Mora's referrals to Plambeck's clinic. Once, Mercier paid Mora $4,000.00.

Viewing the evidence favorably to the verdict and eliminating from consideration testimony of the accomplice witnesses, Mora and Rhodes, in the context of a legal sufficiency challenge at the motion for new trial phase, the trial court must consider whether there was evidence tending to connect Mercier to the conspiracy. Thus, the trial court must consider evidence of the essential element of an agreement to commit barratry. Mercier's former employee, Ortiz, testified as to: (1) Mora's presence in Mercier's office twice weekly; and (2) the instruction that Mora's referrals be further referred to Plambeck. *See Hernandez,* 939 S.W.2d at 176. The trial court could have concluded that the combined weight of the non-accomplice evidence did not sufficiently link Mercier to the offense and, thus, the requirement of article 38.14 was not fulfilled. *Id.; see Hughes v. State,* 24 S.W.3d 833, 840 n. 4 (Tex.Crim.App.2000). After resolving the historical facts and applying the appellate standard for legal sufficiency, the trial court could have concluded that the State did not prove the essential element of an intent to conspire. Similarly, whether the affirmative link factors, viewed in the light most favorable to the prosecution, established the essential element of criminal conspiracy, namely, an agreement to commit barratry, was squarely before the trial court. The trial court concluded the evidence was legally insufficient.

Even so, the trial court was bound by legal sufficiency standards in *Jackson,*

443 U.S. at 319, 99 S.Ct. 2781; *see Savage,* 905 S.W.2d at 274. In the light most favorable to the jury's verdict, the evidence shows that Mercier agreed with one or more persons to "telemarket" vehicular accident victims to increase his business income. The evidence shows Mercier paid Mora, admittedly Plambeck's employee, $4,000 for his work in identifying, contacting, and engaging vehicular accident victims. Non-accomplice evidence shows Mora paid his own employees to refer persons to Mercier's office. A jury could reasonably infer the requisite intent from two requirements in place at the law office, that: (1) solicited persons must execute forms indicating the referral source and requesting Mercier's legal services; and (2) persons solicited by Mora, once signed as clients, must be referred to Plambeck's clinic.

■ The jury, as the trier of fact, may use common sense and apply common knowledge, observation, and experience gained in ordinary affairs when giving effect to the inferences that may be reasonably drawn from the evidence. *Booker v. State,* 929 S.W.2d 57, 60 (Tex.App.-Beaumont 1996, pet. ref'd). As fact finder, the jury is free to accept one version of the facts, reject another, or reject all or any of a witness's testimony. *Penagraph v. State,* 623 S.W.2d 341, 343 (Tex.Crim.App. [Panel Op.] 1981). Simply because the defendant presents a different version of the facts does not render the State's evidence insufficient. *Anderson v. State,* 701 S.W.2d 868, 872 (Tex.Crim.App.1985). As the reviewing court, we may not sit as a thirteenth juror and disregard or reweigh the evidence. *Moreno v. State,* 755 S.W.2d 866, 867 (Tex.Crim.App.1988) (en banc).

After reviewing all the evidence, we conclude that a rational trier of fact could have found beyond a reasonable doubt the essential elements of the offense. We conclude the evidence is legally sufficient. Thus, even applying deferential standards as we must, we conclude that, on this record, the trial court abused its discretion in granting a new trial and vacating the verdict on legal insufficiency grounds. We sustain the State's second issue. We overrule Mercier's fourth cross-point.

## IV. CONCLUSION

We reverse the trial court's order. We remand the cause for entry of judgment reflecting the jury's verdict. We need not reach the State's third and fourth issues. *See* Tex.R.App. P. 47.1. Similarly, we do not reach Mercier's remaining cross-points. *Id.*