

# NUMBER 13-09-00394-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

JOSHUA JAMAL GREEN,                        **Appellant,**

**v.**

THE STATE OF TEXAS,                           **Appellee.**

## On appeal from the Criminal District Court of Jefferson County, Texas.

## MEMORANDUM OPINION

### Before Justices Garza, Vela, and Perkes
### Memorandum Opinion by Justice Perkes

Appellant, Joshua Jamal Green, appeals his conviction for murder, a first-degree felony.[1]  *See* TEX. PENAL CODE ANN. § 19.02(b)(2) (West 2003).  Appellant pleaded not guilty.  After a jury trial, appellant was found guilty, sentenced to sixty years of

---

[1] Pursuant to a docket-equalization order issued by the Supreme Court of Texas, this case is before us on transfer from the Ninth Court of Appeals in Beaumont, Texas.  *See* TEX GOV'T CODE ANN. § 73.001 (West 2005).

confinement in the Texas Department of Criminal Justice, ordered to pay a $10,000 fine plus court costs. By two issues, appellant argues (1) the evidence was factually insufficient to sustain his conviction and (2) the trial court erred in denying his challenge for cause to a prospective juror.[2] We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

One Saturday night in February 2008, two groups of high school students with a longstanding rivalry encountered one another at Mardi Gras in Port Arthur, Texas. Around midnight, when Mardi Gras was about to close, police separated the two groups to prevent a fight from ensuing. The groups then met at a nearby "bus barn" for school buses where police once again intervened. This time, the police stopped and frisked members of both groups and the groups dispersed. Shortly after midnight, the two groups reconvened at the Barbara Jacquet Park at Gilham Circle in Port Arthur for a fight.[3] Using cellular phones to spread word that a fight was about to take place, a crowd gathered to watch the fight. Suddenly, near the basketball court at the park, there was gunfire and the victim, Rory Parker, was shot.

At the park, the victim was still alive, though his speech was too slurred to be understood. A group of the victim's friends placed him in the bed of a pick-up truck and dropped him off at an area emergency room. The victim's friends left the hospital quickly, even though a police officer asked them to stay to provide information about the

---

[2] After counsel filed a brief on appellant's behalf, appellant filed a pro se brief raising additional issues. We will not address these issues as appellant has no right to hybrid representation. *See Scheanette v. State,* 144 S.W.3d 503, 505 n.2 (Tex. Crim. App. 2004).

[3] According to testimony in the record, Gilham Circle is the street surrounding the Barbara Jacquet Park.

2

shooting. The victim died shortly after his arrival at the hospital and an autopsy showed a single gun-shot wound caused his death.

## A. The State's Fact Witnesses

### i. Two Witnesses Positively Identified Appellant as the Shooter

At trial, two witnesses for the State—Tabatha Hicks and Mercedes Lopez—positively identified appellant as the person who shot the victim. A Port Arthur police officer testified Hicks and Lopez voluntarily came forward and gave police statements during their investigation of the shooting.

Hicks was seventeen at the time of trial and a recent high-school graduate. She testified she was walking home with her four-year-old nephew and some girlfriends when she saw appellant shoot the victim. Hicks testified appellant and his friends were near a Dollar General[4] store and then crossed the street to Gilham Circle. Appellant was standing between "Patrick" and an unknown male, when he raised a gun and started firing toward the crowd. Hicks estimated she was about ten feet away from appellant when she saw this. She testified she had known appellant since the seventh grade and that she was certain he was the shooter. After the shooting, the three males, including appellant, ran. On cross-examination, Hicks admitted her cousin, Kenneth Swallow, was in the group that rivaled appellant and appellant's friends. Hicks also admitted Swallow and the victim were close friends and she considered both to be close friends of hers. Hicks knew the victim from school.

---

[4] The testimony in the record concerning the name of the store varied between "Dollar General," "Family Dollar," and "the dollar store."

3

Lopez testified Swallow was also a cousin of hers. Lopez testified she was walking with Hicks, Hicks's nephew, and her own five-year-old nephew, when she saw appellant and two other males walk over to the park from the vicinity of a nearby Family Dollar store. According to Lopez, appellant and his cohorts walked toward the basketball goal and then appellant started shooting a gun. Lopez testified that after shooting, appellant ran and jumped into a white Buick Le Sabre with "blades" or rims on the wheels. Lopez estimated she was about ten feet away from appellant when she saw him shoot. She identified appellant as a former classmate of hers and testified they had attended the same school for three years. Lopez testified she is confident appellant was the shooter and stated she also recognized him by his clothing as she had seen him earlier in the day, prior to the shooting. Lopez testified that at the time of the shooting, appellant wore all black, including a black "do-rag."

### ii. The Victim's Friends' Testimony

The State also called four of the victim's male friends as witnesses—Kory Stewart, Marcus White, Dizavian Sam, and JaQuail Miller. Miller was an eighteen-year-old high-school student at the time of trial. Miller had known appellant since the eighth grade. He testified the plan was for him (i.e., Miller) to fight appellant that night and a crowd gathered at the park, with many people just wanting to see the fight. Miller testified it was pitch black because the lights at the basketball court were off. But he saw a tall figure whom he identified as appellant cross the street from the vicinity of the Family Dollar to the park. Miller did not see the shooter's face, but testified appellant was the

4

tallest in appellant's group of friends and it was the tallest person, standing in the middle of a group of three, who fired. Miller testified he saw "flames" come from this person.

Dizavian Sam testified he was the person nearest to the victim at the time of the shooting. Sam and the victim were standing near illuminated lights in the parkway of Gilham Circle. Sam testified the shots were aimed at him and his group, and came from approximately twenty yards away, from the direction of appellant, and Denzel[5] and Sam Washington. Sam (i.e., Dizavian Sam) testified that after the shooting, appellant and the other two males ran. Sam volunteered that only appellant and the Washingtons would have "come after" him and the victim "like that, no one else."

Stewart testified that he was at the park waiting near a tree when he saw gunfire come from the direction of the Family Dollar. He could not identify the shooter, but had seen appellant at the park before the shooting. Stewart helped place the victim in White's pick-up truck.

White testified he attended Mardi Gras with his girlfriend. After receiving a phone call, White went to Gilham Circle for the fight. He testified he drove the victim and many others (who were uninjured) to the hospital, then went to the victim's home to inform the victim's family about the shooting. White testified he was later stopped by police when he was driving back to the hospital.

---

[5] The record shows one of appellant's friends was called "Denzel Washington," but he is not the famous actor named Denzel Washington.

### iii. A Member of Appellant's Household Threw a Gun in a Lake Shortly After the Shooting

The State also called Marvin Goudeau as a witness. At the time of the shooting, Goudeau was the live-in-boyfriend of appellant's grandmother, Patricia Fairman. Appellant lived with Fairman who had raised him since he was two weeks old.

Goudeau testified his son, Stephen, was friends with appellant. Goudeau learned Stephen was in possession of a gun. After initially denying this, Stephen led Goudeau to the gun which was at Stephen's grandmother's house. The gun was wrapped in a shirt, and after looking at it very briefly, Goudeau drove with his son to a lake and threw the gun in the lake. Goudeau testified the gun looked unusual—it had an eight-inch barrel with holes in it. Goudeau testified he learned, after throwing the gun in the lake, that there had been a shooting overnight and he told police he threw the gun in the lake.

### iv. Testimony from Law Enforcement

In its case-in-chief, the State also called four members of the Port Arthur Police Department, the forensic pathologist who performed the autopsy on the victim, and a deputy with the Jefferson County Regional Crime Lab. Officer Calvin Walker testified he encountered the victim's friends Sam and Stewart in the hospital parking lot after the victim had been dropped off at the emergency room, and he took them to the police department for questioning. A Port Arthur policeman also pulled over White and took him and his passengers in for questioning. White was reluctant to tell the officer where he was coming from. A single shell casing was recovered from the park.

### B. The Defense

In addition to cross examining the State's witnesses, appellant's counsel called seven witnesses to testify at trial. Five of the witnesses—Earl Jackson, James Keal, Dominique Matthews, Samuel Washington, and Patrick Matthews —were close friends of appellant. Appellant's father, Gregory Gray, and appellant's paternal grandmother, Fairman, also testified.

#### i. Appellant's Friends' Testimony

Earl Jackson testified appellant and their friend Donell Guidry were about the same height, approximately six feet three inches tall or six feet four inches tall, but that Guidry was probably a little taller than appellant. The record shows Guidry drove the white Buick Le Sabre and was estimated to be in his mid-twenties.

With some variations between their testimony, the remainder of appellant's friends' testimony can be summarized as follows: Appellant did not possess or shoot a gun any time they were with him. After police intervened at the bus barn, together with appellant, they walked near the Dollar General en route to Fairman's house. As they were walking, Fairman drove by and offered them a ride, but they declined her offer. Shortly after they arrived at Fairman's house, a group of males came by and started shooting at them while they were outside in the front yard.[6]

Appellant's witnesses' testimony varied in regard to whether these shooters were on foot or in a vehicle and whether anyone at the house called the police to report the

---

[6] James Keal's testimony was slightly different than that of appellant's other friends. Keal testified appellant was his best friend. Keal admitted police detained Keal for about thirty to forty-five minutes at the bus barn because he was in possession of marihuana. Keal testified he does not know where appellant was during that time, but that he subsequently met appellant at Fairman's house before a group of males came by on foot and started shooting at the house.

shooting. Most of appellant's witnesses testified the shooters were on foot, but Patrick Matthews testified the shooters were in White's green truck, drove by at least twice, while White screamed, "We're going to kill you." Patrick Matthews also testified the reason they declined a ride from Fairman was that they were walking to a female's house, but decided against visiting her because it was too late.

Most of appellant's witnesses testified no one called the police to report the shooting at Fairman's house because within a minute or two of the shooting, a police car came from around the corner and the officers asked about the shooting. According to appellant's witnesses, they reported the shooting to these police officers, and the police drove away, but did not do anything about this shooting. Dominique Matthews testified Fairman called the police and then reported the shooting to them when they arrived. Dominique's brother, Patrick, testified the police arrived without being called, but Fairman probably called the police anyway after the police in the patrol car drove away.

A couple of appellant's witnesses testified to receiving phone calls about the shooting of the victim. Jackson testified that after their group arrived at Fairman's house, their phones started "ringing off the hook" with callers saying appellant had just shot the victim. Patrick Matthews testified that around one o'clock in the morning, he started receiving numerous phone calls in which the caller would ask questions like, "Why did you all kill him?"

Patrick Matthews and Samuel Washington testified they gave statements to defense counsel, but never provided witness statements to the police. Matthews volunteered that he decided to give defense counsel a statement after he learned

8

appellant had turned himself in to the police. Samuel Washington[7] testified that acting on Fairman's instruction, he gave defense counsel a statement instead of approaching the police to give them a statement.

### ii. Appellant's Father's and Grandmother's Testimony

Appellant's father, Gregory Gray, and his paternal grandmother, Fairman, testified about their knowledge of events just after the shooting of the victim, and about how they decided to conduct their own investigation after learning on Sunday that appellant was suspected in the shooting. Gray testified he was on the couch in the living room while appellant and his friends congregated outside in front of the house. Gray estimated that after the shooting in front of the house, appellant and his friends stayed outside another twenty to twenty-five minutes. Gray testified appellant stayed at the house for one or two days after the shooting at the park at Gilham Circle, then disappeared. Gray testified he did not know where appellant was during this time, and it was unusual for appellant to disappear like this. By phone, Gray told appellant he would hire a good lawyer for appellant and then about seven to eight days after the shooting at the park, he assisted appellant in turning himself in to police. Gray testified that by that time, appellant's photograph was being shown on television.

Fairman testified that on the night of the shooting, she left her home to pick up appellant and other grandchildren from Mardi Gras because she had learned from a friend there was about to be a fight at Mardi Gras. Fairman testified she did not see any

---

[7] At the time of trial, Samuel Washington was a recent high-school graduate. He testified he grew up with appellant and they were close friends. He testified that after the police intervention at the bus barn, he walked along Eighth Street alone and later met up with his group of friends at appellant's grandmother's house. He estimated he was apart from his friends for ten to fifteen or thirty minutes.

crowd at the Barbara Jacquet Park or Gilham Circle that night, but after driving around, she saw appellant and some friends walking together by the Family Dollar store. She accused appellant of fighting and offered him and his friends a ride in her car. Fairman testified appellant made no admission of fighting, and her offer for a ride was declined because appellant and his friends could not fit in her car. She testified appellant and his friends walked to her house and she drove home. Fairman testified that after she arrived home and retired to her bedroom, someone fired shots at her home that night, and the police arrived before they were even called.

Fairman testified she learned of the shooting at the park Sunday afternoon while she was at church. She went home from church and shortly after arriving home, someone drove by shooting at her house again. She called and reported this shooting to the police. She testified that after speaking with appellant and his father at her house, she decided to drive around looking for appellant's friends to find out what they knew about the shooting at the park.

On cross-examination, Fairman admitted that in general, her home had been shot at many times. She testified she did not know whether appellant was a member of a gang and that she could not say whether drive-by shootings could be gang-related. Fairman testified that from Sunday through Thursday, appellant remained at her house. She testified that after that, appellant disappeared for days and his family members did not know where he had gone. According to Fairman's testimony, appellant's disappearance was not unusual as several months before the shooting at the park,

10

appellant had started leaving to stay at his girlfriend's house for short periods without telling his family his whereabouts.

## C. The State's Rebuttal Testimony

After the defense rested, the State called Investigator Marcelo Molfino of the Port Arthur Police Department as a rebuttal witness. Molfino testified that ten to fifteen minutes after the groups dispersed from the bus barn, a message was dispatched on police radio about a shooting at Gilham Circle. In preparation for his trial testimony, Molfino checked the dispatch logs and confirmed no message concerning a shooting at appellant's grandmother's house was dispatched overnight, though police logs showed a service call from the grandmother's house was made Sunday afternoon at around 2:30 p.m. In other words, the police had no record that anyone shot at appellant's grandmother's house overnight as she and appellant's other witnesses claimed.

Molfino testified a dispatch is made anytime something serious happens, such as a shooting. According to Molfino, even if an officer responded to a shooting before a citizen called for help, for safety purposes, the officer would call out and let his dispatcher know he was responding to a shooting. The shooting would then appear in the dispatch log. Molfino testified it would be highly unusual for an officer to fail to do this when responding to a shooting. Molfino also testified appellant's grandmother, Fairman, had lied to him and law enforcement before (between 2007 and 2008) when he was investigating one of her sons in connection with a string of armed robberies of gas stations.

11

## II. STANDARDS OF REVIEW AND DISCUSSION

### A. The Sufficiency of the Evidence to Sustain Appellant's Conviction

By his second issue, appellant argues the evidence was factually insufficient to prove he is the person who murdered the victim by shooting him. Appellant emphasizes only two of the State's witnesses, Hicks and Lopez, testified they saw appellant shoot the victim and these witnesses were friends of each other. Appellant also emphasizes that he presented seven witnesses who testified he did not shoot the victim or possess a gun at any relevant time.

We review a sufficiency challenge styled as a "factual sufficiency" challenge under the *Jackson v. Virginia* sufficiency standard. *See Jackson v. Virginia,* 443 U.S. 307, 318–19 (1979); *Brooks v. State,* 323 S.W.3d 893, 894 (Tex. Crim. App. 2010) (plurality op.); *Ervin v. State*, 331 S.W.3d 49, 54 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd). "It bears emphasizing that a rigorous and proper application of the *Jackson v. Virginia* legal-sufficiency standard is as exacting a standard as any factual-sufficiency standard (especially one that is 'barely distinguishable' or indistinguishable from a *Jackson v. Virginia* legal-sufficiency standard)." *Brooks,* 323 S.W.3d at 906.

Under this standard, when conducting a sufficiency review, a reviewing court must ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt—not whether it believes the evidence at trial established guilt beyond a reasonable doubt. *Brooks,* 323 S.W.3d at 894; *Laster v. State,* 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). In doing so, we assess all of the evidence in the light most favorable to the prosecution. *Laster,* 275 S.W.3d at 517 (quoting *Jackson,* 443

12

U.S. at 319).  We must presume that the fact finder resolved any conflicting inferences in favor of the prosecution and defer to that resolution.  *Jackson,* 443 U.S. at 326.

When, as here, the testimony of the State's witnesses conflicts with the testimony of the defendant's witnesses, the jury may believe all, part, or none of any witness's testimony.  *State v. Mercier*, 164 S.W.3d 799, 813–14 (Tex. App.—Corpus Christi 2005, pet. ref'd); *Moody v. State*, 830 S.W.2d 698, 699–700 (Tex. App.—Houston [1st Dist.] 1992, pet ref'd).  The jury resolves questions about the credibility of witnesses and the weight to be given to their testimony.  *Mercier*, 164 S.W.3d at 813–14; *Moody*, 830 S.W.2d at 700.  Conflicts in testimony do not require reversal of a conviction when there is enough credible testimony to support the conviction.  *Moody*, 830 S.W.2d at 700.

### ii.  The Elements of Murder and Analysis

We measure the sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge.  *Villarreal v. State,* 286 S.W.3d 321, 327 (Tex. Crim. App.  2009) (citing *Malik v. State,* 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).  Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof, or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.  *Id.*  A person commits murder if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual.  TEX. PENAL CODE ANN. § 19.02(b)(2).

After reviewing the evidence in the appellate record, we conclude a rational jury could have found beyond a reasonable doubt that appellant committed murder.  *See*

13

*Jackson*, 443 U.S. at 326. Hicks and Lopez testified they saw appellant commit the shooting and had known him for many years and identified him with certainty. Miller's testimony about the shooter's height also implicated appellant, and it was for the jury to consider and weigh evidence in the record that one of appellant's friends, Guidry, was also tall. Like Hicks and Lopez, Miller testified the shooter was standing with two other males at the time of the shooting. As set forth above, Miller testified he saw a tall figure whom he identified as appellant cross the street to the park. Miller did not see the shooter's face, but testified appellant was the tallest in appellant's group of friends and it was the tallest person, standing in the middle of a group of three, who fired. Miller testified he saw "flames" come from this person. Dizavian Sam testified the shots came from appellant's direction. The jury was free to believe the testimony of the State's witnesses and to disbelieve appellant's witnesses. *See Mercier*, 164 S.W.3d at 813–14; *Moody*, 830 S.W.2d at 699–700.

The jury was also free to consider appellant's father's testimony that appellant disappeared for several days after the shooting as evidence of appellant's consciousness of guilt. "A 'consciousness of guilt' is perhaps one of the strongest kinds of evidence of guilt." *Hyde v. State,* 846 S.W.2d 503, 505 (Tex. App.—Corpus Christi 1993, pet. ref'd) (quoting *Torres v. State,* 794 S.W.2d 596, 598–600 (Tex. App.—Austin 1990, no pet.)). "It is consequently a well accepted principle that any conduct on the part of a person accused of a crime subsequent to its commission, which indicates a 'consciousness of guilt' may be received as a circumstance tending to prove that he committed the act with which he is charged." *Torres,* 794 S.W.2d at 598 (internal quotations omitted).

14

Evidence of flight shows a consciousness of guilt of the crime for which the defendant is on trial. *Bigby v. State*, 892 S.W.2d 864, 884 (Tex. Crim. App. 1994), *overruled in part on other grounds by Tennard v. Dretke,* 542 U.S. 274 (2004). Here, appellant's father testified it was unusual for appellant to leave his home for several days without telling his family members where he was going. Appellant left his home shortly after the shooting of the victim, when at least two members of his household had received information implicating appellant as the shooter. *See id.* Appellant's second issue is overruled.

## B. Appellant's Challenge for Cause to a Venireperson

By his first issue on appeal, appellant argues the trial court abused its discretion by denying his challenge for cause to a prospective juror who worked as a prison supervisor. Appellant argues that because the trial court denied his challenge for cause concerning this venireperson, he was forced to use a peremptory strike to remove him from the jury panel and as a result, another objectionable juror was seated because appellant did not have a peremptory strike to use against her. The record shows that after initially expressing bias in favor of the State, the prison supervisor stated he could follow the law and serve as an impartial juror:

> DEFENSE COUNSEL: . . . Your punishment range is 5 to 99 years or life. . . . . Now, what that tells me is you don't automatically think a life for a life. Well, the range is wide. That means that in order for you to say I'll give consideration, the Judge used the term "good faith consideration," okay. That means that you have to honestly say I will consider all of it, from 5 all the way up to life. You can't be going in saying, well, in a murder case, I'm always going to be on the heavy side. You have to be able to wait, hear what the facts of the case are and then make a decision. Does everybody understand that? I don't want anybody coming in with any preconceived notions. Do I have anybody that's dealing with that now? Yes, sir.
>
> A JUROR: I do.

15

DEFENSE COUNSEL:   And you are Juror No. 11.   Is it [venire person's surname]?

VENIREPERSON:   Yes.

DEFENSE COUNSEL:   Tell me what you're thinking, sir.

VENIREPERSON:   I work in the prison system.   I'm a supervisor of a prison.

THE COURT:   We'll talk to him in a few minutes.

Subsequently, before the trial court, without the presence of the entire panel, the

venireperson in question explained his bias as follows:

DEFENSE COUNSEL:   . . . [Y]ou started to tell us in response to one of my questions that you work in the prison and I think you were going to tell us that it gives you some opinion one way or the other; but I don't want to put words in your mouth.

VENIREPERSON:   Yes, sir, it does.   I've worked for the prison system for 14 and a half years and it's just – I'm not saying he's guilty, but just my feeling, it's – it's like I'm almost on you-all's side just a little bit.

DEFENSE COUNSEL:   When you say "you-all's side," because I want to keep the record clear, you're actually pointing towards the State prosecutor when you say that; it that right?

VENIREPERSON:   Yes, sir.

DEFENSE COUNSEL:   You remember I gave you an example that I get to start out ahead of [the prosecutor] and if you're at a race line, because of the presumption of innocence, I'm supposed to start out ahead?

VENIREPERSON:   Yes, sir.

DEFENSE COUNSEL:   Am I going to get to start out ahead in this race with you?

VENIREPERSON:   I think it will be even.   I don't think it would be.

DEFENSE COUNSEL:   You understand the presumption of innocence and I'm supposed to start out ahead?

16

VENIREPERSON:   Yes, sir.

DEFENSE COUNSEL:   And are you not going to get to do that?

VENIREPERSON:   I'm just telling you how I feel.

DEFENSE COUNSEL:   Remember, I'm going to respect your opinion. I'm just trying to make sure I understand your opinion.

VENIREPERSON:   Yes, sir.

DEFENSE COUNSEL:   Do I understand you're going to force me to be on a level playing field with him, starting out at the start line together?

VENIREPERSON:   I think it's going to be even between both of you-all; but just my feeling with me working in the prison, with the things that I have to go through and the things I have gone through, I just don't think I could be that fair.

DEFENSE COUNSEL:   If you were Mr. Green, do you think that –

VENIREPERSON:   If I was Mr. Green, I wouldn't want me sitting up there, Judge.

DEFENSE COUNSEL:   Now, tell me why.

VENIREPERSON:   Because I just don't think it would be fair to him.

THE COURT:   Say that again, sir.

VENIREPERSON:   I don't think it would be fair to him. If I was Mr. Green and I was sitting in Mr. Green's seat, I don't think it would be – I don't think it would be fair.

DEFENSE COUNSEL:   Because you're leaning toward the State? They are already starting out, giving them some – some head start to some degree, right?

VENIREPERSON:   I guess.

THE COURT:  Why do you – can you articulate for us why you think it wouldn't be fair for you, if you were him, to pick you as a juror?

VENIREPERSON:   I just from – I don't know if it sounds right – just from

17

me being in the prison.

THE COURT:   What about it?

VENIREPERSON:   I've been assaulted in the prison.   I've been stabbed in the prison and going to court, coming from court and I just don't think it would be fair, sir.   I don't know if it's not making any sense what I'm saying.

THE COURT:   I'm just asking you.   I know you're making that conclusion, but do those experiences tend to make you feel a little biassed [sic] against someone who is charged with a crime?

VENIREPERSON:   Yes.

THE COURT:   Not to put words in your mouth but –

VENIREPERSON:   It's like that but I don't think it's 100 percent and when I walked in and you-all was talking about like it was murder and when I walk in the prison and I'm with murderers and they might do stuff and I have to investigate the situation and, you know, it's just hard for me.   It's just hard.

After this exchange, in response to questioning from the State and the trial court, the venireperson stated he would hold the State to its burden of proof, he could be fair and impartial if he were a juror in this case and reach a decision based upon the law and the evidence without reference to his personal experiences.   Afterward, when defense counsel asked the venireperson whether he had changed his position, he answered it was not a change in position; he had just been expressing his discomfort which stemmed from his work as a prison supervisor.   In response to a question from defense counsel, the venireperson answered that he did not have anything against appellant and if he had to vote on guilt-innocence during voir dire, he would vote "not guilty" because of the presumption of innocence.

18

### i. Standard of Review for Denial of a Challenge for Cause

A defendant may properly challenge any prospective juror who has a bias or prejudice against the defendant or any phase of the law upon which he is entitled to rely. *See* TEX. CODE CRIM. PROC. ANN. art. 35.16(a)(9), (c)(2) (West 2006). When reviewing a trial court's decision to grant or deny a challenge for cause, we look at the entire record to determine if there is sufficient evidence to support the trial court's ruling. *Feldman v. State,* 71 S.W.3d 738, 750 (Tex. Crim. App. 2002), *superseded by statute on other grounds,* TEX. CODE CRIM. PROC. ANN. art. 37.071, *as recognized in Coleman v. State,* No. AP–75478, 2009 WL 4696064 (Tex. Crim. App. Dec. 9, 2009) (per curiam); *Patrick v. State,* 906 S.W.2d 481, 488 (Tex. Crim. App. 1995). The test is whether the bias or prejudice would substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with the law. *Feldman,* 71 S.W.3d at 743–45. Before a prospective juror may be excused for cause on this basis, however, the law must be explained to him and he must be asked whether he can follow that law regardless of his personal views. *Id.*

The proponent of a challenge for cause bears the burden of establishing that his challenge is proper. *Id.* at 747. The proponent does not meet his burden until he has shown that the veniremember understood the requirements of the law and could not overcome his prejudice well enough to follow it. *Id.* When the record reflects that a venireperson vacillated or equivocated on his ability to follow the law, the reviewing court must defer to the trial court's decision on a challenge for cause. *Moore v. State,* 999 S.W.2d 385, 400 (Tex. Crim. App. 1999); *Brown v. State,* 913 S.W.2d 577, 580 (Tex.

19

Crim. App. 1996). We give great deference to the trial court's decision because the trial judge is able to observe the venireperson's demeanor and to listen to his tone of voice. *Feldman*, 71 S.W.3d at 744.

### ii. Preservation of Error

To preserve error on the denial of a challenge for cause, an appellant must demonstrate on the record that (1) he asserted a clear and specific challenge for cause, (2) he used a peremptory challenge on the complained-of venireperson, (3) all of his peremptory challenges were exhausted, (4) his request for additional strikes was denied, and (5) as a result, an objectionable juror sat on the jury. *Feldman*, 71 S.W.3d at 744. Error is not preserved when an appellant waits until after the parties have made peremptory challenges and the identities of the jurors are revealed, to advise the trial court that a peremptory challenge was used to strike a venireperson who was challenged for cause, to request an additional peremptory strike, and to identify a chosen juror as someone against whom he would have used a peremptory challenge. *McBean v. State*, 167 S.W.3d 334, 339 (Tex. App.—Amarillo 2004, pet. ref'd).

Here, appellant failed to preserve error concerning the trial court's denial of his challenge for cause to the male venireperson who worked as a prison supervisor. Appellant did not request an additional peremptory challenge and identify the female venireperson as objectionable until after the parties exercised their peremptory challenges and he saw the juror list. *See id.* Further, even if appellant had preserved error, we defer to the trial court's decision to deny appellant's challenge for cause because the record shows the prison supervisor was a vacillating juror who ultimately

20

stated he could impartially follow the law. *See Brown*, 913 S.W.2d at 580–81. In *Brown*, the Court of Criminal Appeals held it was bound to defer to the trial court's denial of a challenge for cause to a venireperson who vacillated between stating she would be able to follow the law and stating she did not know for certain whether she could follow the law. *Id.* Appellant's first issue is overruled.

### III. CONCLUSION

We affirm the trial court's judgment.

_____
GREGORY T. PERKES
Justice

Do not publish.   TEX. R. APP. P. 47.2(b).

Delivered and filed the
23rd day of August, 2011.