NUMBER 13-09-00394-CR

 

COURT OF APPEALS

 

THIRTEENTH DISTRICT
OF TEXAS

 

CORPUS CHRISTI - EDINBURG  

                                                                                                                     


 

JOSHUA JAMAL GREEN,                                                           Appellant, 

 

  v.

 

THE STATE OF TEXAS,                                  
                   Appellee.

                                                                                                                     
  

 

On appeal from the Criminal
District Court 

of Jefferson County,
Texas.

                                                                                                                     


 

MEMORANDUM OPINION

 

Before Justices Garza,
Vela, and Perkes   

Memorandum Opinion by
Justice Perkes 

 

            Appellant,
Joshua Jamal Green, appeals his conviction for murder, a first-degree felony.[1] 
See Tex. Penal Code Ann. §
19.02(b)(2) (West 2003).  Appellant pleaded not guilty.  After a jury trial,
appellant was found guilty, sentenced to sixty years of confinement in the
Texas Department of Criminal Justice, ordered to pay a $10,000 fine plus court
costs.  By two issues, appellant argues (1) the evidence was factually
insufficient to sustain his conviction and (2) the trial court erred in denying
his challenge for cause to a prospective juror.[2] 
We affirm.  

I.  FACTUAL AND
PROCEDURAL BACKGROUND

One Saturday
night in February 2008, two groups of high school students with a longstanding
rivalry encountered one another at Mardi Gras in Port Arthur, Texas.  Around
midnight, when Mardi Gras was about to close, police separated the two groups
to prevent a fight from ensuing.  The groups then met at a nearby “bus barn”
for school buses where police once again intervened.  This time, the police
stopped and frisked members of both groups and the groups dispersed.  Shortly
after midnight, the two groups reconvened at the Barbara Jacquet Park at Gilham
Circle in Port Arthur for a fight.[3] 
Using cellular phones to spread word that a fight was about to take place, a
crowd gathered to watch the fight.  Suddenly, near the basketball court at the
park, there was gunfire and the victim, Rory Parker, was shot.  

At
the park, the victim was still alive, though his speech was too slurred to be
understood.  A group of the victim’s friends placed him in the bed of a pick-up
truck and dropped him off at an area emergency room.  The victim’s friends left
the hospital quickly, even though a police officer asked them to stay to
provide information about the shooting.  The victim died shortly after his
arrival at the hospital and an autopsy showed a single gun-shot wound caused
his death.

A.   The
State’s Fact Witnesses 

i.     
Two Witnesses Positively Identified Appellant as the
Shooter

At
trial, two witnesses for the State—Tabatha Hicks and Mercedes Lopez— positively
identified appellant as the person who shot the victim.  A Port Arthur police officer
testified Hicks and Lopez voluntarily came forward and gave police statements
during their investigation of the shooting.  

Hicks
was seventeen at the time of trial and a recent high-school graduate.  She testified
she was walking home with her four-year-old nephew and some girlfriends when
she saw appellant shoot the victim.  Hicks testified appellant and his friends
were near a Dollar General[4]
store and then crossed the street to Gilham Circle.  Appellant was standing
between “Patrick” and an unknown male, when he raised a gun and started firing
toward the crowd.  Hicks estimated she was about ten feet away from appellant
when she saw this.  She testified she had known appellant since the seventh
grade and that she was certain he was the shooter.  After the shooting, the
three males, including appellant, ran.  On cross-examination, Hicks admitted
her cousin, Kenneth Swallow, was in the group that rivaled appellant and
appellant’s friends.  Hicks also admitted Swallow and the victim were close
friends and she considered both to be close friends of hers.  Hicks knew the victim
from school. 

Lopez
testified Swallow was also a cousin of hers.  Lopez testified she was walking
with Hicks, Hicks’s nephew, and her own five-year-old nephew, when she saw
appellant and two other males walk over to the park from the vicinity of a nearby
Family Dollar store.  According to Lopez, appellant and his cohorts walked
toward the basketball goal and then appellant started shooting a gun.  Lopez
testified that after shooting, appellant ran and jumped into a white Buick Le
Sabre with “blades” or rims on the wheels.  Lopez estimated she was about ten
feet away from appellant when she saw him shoot.  She identified appellant as a
former classmate of hers and testified they had attended the same school for
three years.  Lopez testified she is confident appellant was the shooter and
stated she also recognized him by his clothing as she had seen him earlier in
the day, prior to the shooting.  Lopez testified that at the time of the
shooting, appellant wore all black, including a black “do-rag.”

ii.  The
Victim’s Friends’ Testimony

The
State also called four of the victim’s male friends as witnesses—Kory Stewart,
Marcus White, Dizavian Sam, and JaQuail Miller.  Miller was an eighteen-year-old
high-school student at the time of trial.  Miller had known appellant since the
eighth grade.  He testified the plan was for him (i.e., Miller) to fight
appellant that night and a crowd gathered at the park, with many people just
wanting to see the fight.  Miller testified it was pitch black because the
lights at the basketball court were off.  But he saw a tall figure whom he
identified as appellant cross the street from the vicinity of the Family Dollar
to the park.  Miller did not see the shooter’s face, but testified appellant
was the tallest in appellant’s group of friends and it was the tallest person,
standing in the middle of a group of three, who fired.  Miller testified he saw
“flames” come from this person.  

Dizavian
Sam testified he was the person nearest to the victim at the time of the
shooting.  Sam and the victim were standing near illuminated lights in the
parkway of Gilham Circle.  Sam testified the shots were aimed at him and his
group, and came from approximately twenty yards away, from the direction of
appellant, and Denzel[5]
and Sam Washington.  Sam (i.e., Dizavian Sam) testified that after the
shooting, appellant and the other two males ran.  Sam volunteered that only
appellant and the Washingtons would have “come after” him and the victim “like
that, no one else.”  

Stewart
testified that he was at the park waiting near a tree when he saw gunfire come
from the direction of the Family Dollar.  He could not identify the shooter,
but had seen appellant at the park before the shooting.  Stewart helped place
the victim in White’s pick-up truck.

White
testified he attended Mardi Gras with his girlfriend.  After receiving a phone
call, White went to Gilham Circle for the fight.  He testified he drove the victim
and many others (who were uninjured) to the hospital, then went to the victim’s
home to inform the victim’s family about the shooting.  White testified he was later
stopped by police when he was driving back to the hospital.

 

 

 

iii.     A Member of
Appellant’s Household Threw a Gun in a Lake Shortly After the Shooting

The
State also called Marvin Goudeau as a witness.  At the time of the shooting,
Goudeau was the live-in-boyfriend of appellant’s grandmother, Patricia Fairman. 
Appellant lived with Fairman who had raised him since he was two weeks old.  

Goudeau
testified his son, Stephen, was friends with appellant.  Goudeau learned
Stephen was in possession of a gun.  After initially denying this, Stephen led
Goudeau to the gun which was at Stephen’s grandmother’s house.  The gun was
wrapped in a shirt, and after looking at it very briefly, Goudeau drove with
his son to a lake and threw the gun in the lake.  Goudeau testified the gun looked
unusual—it had an eight-inch barrel with holes in it.  Goudeau testified he
learned, after throwing the gun in the lake, that there had been a shooting overnight
and he told police he threw the gun in the lake.

iv.    
Testimony from Law Enforcement

In
its case-in-chief, the State also called four members of the Port Arthur Police
Department, the forensic pathologist who performed the autopsy on the victim,
and a deputy with the Jefferson County Regional Crime Lab.  Officer Calvin Walker
testified he encountered the victim’s friends Sam and Stewart in the hospital
parking lot after the victim had been dropped off at the emergency room, and he
took them to the police department for questioning.  A Port Arthur policeman
also pulled over White and took him and his passengers in for questioning. 
White was reluctant to tell the officer where he was coming from.  A single
shell casing was recovered from the park.

 

 

B.    The
Defense

In
addition to cross examining the State’s witnesses, appellant’s counsel called seven
witnesses to testify at trial.  Five of the witnesses—Earl Jackson, James Keal,
Dominique Matthews, Samuel Washington, and Patrick Matthews —were close friends
of appellant.  Appellant’s father, Gregory Gray, and appellant’s paternal
grandmother, Fairman, also testified. 

i.     
Appellant’s Friends’ Testimony

Earl
Jackson testified appellant and their friend Donell Guidry were about the same
height, approximately six feet three inches tall or six feet four inches tall,
but that Guidry was probably a little taller than appellant.  The record shows
Guidry drove the white Buick Le Sabre and was estimated to be in his mid-twenties.

With
some variations between their testimony, the remainder of appellant’s friends’
testimony can be summarized as follows:  Appellant did not possess or shoot a
gun any time they were with him.  After police intervened at the bus barn, together
with appellant, they walked near the Dollar General en route to Fairman’s
house.  As they were walking, Fairman drove by and offered them a ride, but
they declined her offer.  Shortly after they arrived at Fairman’s house, a
group of males came by and started shooting at them while they were outside in
the front yard.[6] 


           Appellant’s
witnesses’ testimony varied in regard to whether these shooters were on foot or
in a vehicle and whether anyone at the house called the police to report the
shooting.  Most of appellant’s witnesses testified the shooters were on foot,
but Patrick Matthews testified the shooters were in White’s green truck, drove
by at least twice, while White screamed, “We’re going to kill you.”  Patrick
Matthews also testified the reason they declined a ride from Fairman was that
they were walking to a female’s house, but decided against visiting her because
it was too late.

Most
of appellant’s witnesses testified no one called the police to report the
shooting at Fairman’s house because within a minute or two of the shooting, a
police car came from around the corner and the officers asked about the
shooting.  According to appellant’s witnesses, they reported the shooting to
these police officers, and the police drove away, but did not do anything about
this shooting.  Dominique Matthews testified Fairman called the police and then
reported the shooting to them when they arrived.  Dominique’s brother, Patrick,
testified the police arrived without being called, but Fairman probably called
the police anyway after the police in the patrol car drove away.

A
couple of appellant’s witnesses testified to receiving phone calls about the
shooting of the victim.  Jackson testified that after their group arrived at
Fairman’s house, their phones started “ringing off the hook” with callers
saying appellant had just shot the victim.  Patrick Matthews testified that
around one o’clock in the morning, he started receiving numerous phone calls in
which the caller would ask questions like, “Why did you all kill him?”  

Patrick
Matthews and Samuel Washington testified they gave statements to defense
counsel, but never provided witness statements to the police.  Matthews
volunteered that he decided to give defense counsel a statement after he
learned appellant had turned himself in to the police.  Samuel Washington[7]
testified that acting on Fairman’s instruction, he gave defense counsel a
statement instead of approaching the police to give them a statement. 

ii. 
Appellant’s Father’s and Grandmother’s Testimony 

            Appellant’s
father, Gregory Gray, and his paternal grandmother, Fairman, testified about
their knowledge of events just after the shooting of the victim, and about how
they decided to conduct their own investigation after learning on Sunday that
appellant was suspected in the shooting.  Gray testified he was on the couch in
the living room while appellant and his friends congregated outside in front of
the house.  Gray estimated that after the shooting in front of the house, appellant
and his friends stayed outside another twenty to twenty-five minutes.  Gray
testified appellant stayed at the house for one or two days after the shooting
at the park at Gilham Circle, then disappeared.  Gray testified he did not know
where appellant was during this time, and it was unusual for appellant to
disappear like this.  By phone, Gray told appellant he would hire a good lawyer
for appellant and then about seven to eight days after the shooting at the park,
he assisted appellant in turning himself in to police.  Gray testified that by
that time, appellant’s photograph was being shown on television. 

            Fairman
testified that on the night of the shooting, she left her home to pick up
appellant and other grandchildren from Mardi Gras because she had learned from
a friend there was about to be a fight at Mardi Gras.  Fairman testified she
did not see any crowd at the Barbara Jacquet Park or Gilham Circle that night,
but after driving around, she saw appellant and some friends walking together
by the Family Dollar store.  She accused appellant of fighting and offered him
and his friends a ride in her car.  Fairman testified appellant made no
admission of fighting, and her offer for a ride was declined because appellant
and his friends could not fit in her car.  She testified appellant and his
friends walked to her house and she drove home.  Fairman testified that after
she arrived home and retired to her bedroom, someone fired shots at her home
that night, and the police arrived before they were even called.

            Fairman
testified she learned of the shooting at the park Sunday afternoon while she
was at church.  She went home from church and shortly after arriving home,
someone drove by shooting at her house again.  She called and reported this
shooting to the police.  She testified that after speaking with appellant and
his father at her house, she decided to drive around looking for appellant’s
friends to find out what they knew about the shooting at the park.  

            On
cross-examination, Fairman admitted that in general, her home had been shot at
many times.  She testified she did not know whether appellant was a member of a
gang and that she could not say whether drive-by shootings could be gang-related. 
Fairman testified that from Sunday through Thursday, appellant remained at her
house.  She testified that after that, appellant disappeared for days and his
family members did not know where he had gone.  According to Fairman’s
testimony, appellant’s disappearance was not unusual as several months before
the shooting at the park, appellant had started leaving to stay at his
girlfriend’s house for short periods without telling his family his
whereabouts.

C.    The
State’s Rebuttal Testimony

After
the defense rested, the State called Investigator Marcelo Molfino of the Port
Arthur Police Department as a rebuttal witness.  Molfino testified that ten to
fifteen minutes after the groups dispersed from the bus barn, a message was
dispatched on police radio about a shooting at Gilham Circle.  In preparation
for his trial testimony, Molfino checked the dispatch logs and confirmed no
message concerning a shooting at appellant’s grandmother’s house was dispatched
overnight, though police logs showed a service call from the grandmother’s
house was made Sunday afternoon at around 2:30 p.m.  In other words, the police
had no record that anyone shot at appellant’s grandmother’s house overnight as
she and appellant’s other witnesses claimed.  

Molfino
testified a dispatch is made anytime something serious happens, such as a
shooting.  According to Molfino, even if an officer responded to a shooting
before a citizen called for help, for safety purposes, the officer would call
out and let his dispatcher know he was responding to a shooting.  The shooting
would then appear in the dispatch log.  Molfino testified it would be highly
unusual for an officer to fail to do this when responding to a shooting.  Molfino
also testified appellant’s grandmother, Fairman, had lied to him and law enforcement
before (between 2007 and 2008) when he was investigating one of her sons in
connection with a string of armed robberies of gas stations.  




 

II.   
STandards of review and
discussion

A.  
 The
Sufficiency of the Evidence to Sustain Appellant’s Conviction

            By his second issue, appellant argues the
evidence was factually insufficient to prove he is the person who murdered the victim
by shooting him.  Appellant emphasizes only two of the State’s witnesses, Hicks
and Lopez, testified they saw appellant shoot the victim and these witnesses
were friends of each other.  Appellant also emphasizes that he presented seven
witnesses who testified he did not shoot the victim or possess a gun at any relevant
time.

We review a sufficiency challenge styled
as a “factual sufficiency” challenge under the Jackson v. Virginia sufficiency
standard.  See Jackson v. Virginia, 443 U.S. 307, 318–19 (1979); Brooks
v. State, 323 S.W.3d 893, 894 (Tex. Crim. App. 2010) (plurality op.); Ervin
v. State, 331 S.W.3d 49, 54 (Tex. App.—Houston [1st Dist.] 2010, pet. ref’d). 
“It bears emphasizing that a rigorous
and proper application of the Jackson v. Virginia legal-sufficiency
standard is as exacting a standard as any factual-sufficiency standard
(especially one that is ‘barely distinguishable’ or indistinguishable from a Jackson
v. Virginia legal-sufficiency standard).”  Brooks, 323 S.W.3d at
906.  

Under this standard, when conducting a
sufficiency review, a reviewing court must ask whether any rational trier of
fact could have found the essential elements of the crime beyond a reasonable
doubt—not whether it believes the evidence at trial established guilt beyond a
reasonable doubt.  Brooks, 323 S.W.3d at 894; Laster v. State,
275 S.W.3d 512, 517 (Tex. Crim. App. 2009).  In doing so, we assess all of the
evidence in the light most favorable to the prosecution.  Laster, 275
S.W.3d at 517 (quoting Jackson, 443 U.S. at 319).  We must presume that
the fact finder resolved any conflicting inferences in favor of the prosecution
and defer to that resolution.  Jackson, 443 U.S. at 326.  

When, as here, the testimony of the
State’s witnesses conflicts with the testimony of the defendant’s witnesses,
the jury may believe all, part, or none of any witness’s testimony.  State
v. Mercier, 164 S.W.3d 799, 813–14 (Tex. App.—Corpus Christi 2005, pet.
ref’d); Moody v. State, 830 S.W.2d 698, 699–700 (Tex. App.—Houston [1st
Dist.] 1992, pet ref’d).  The jury resolves questions about the credibility of
witnesses and the weight to be given to their testimony.  Mercier, 164
S.W.3d at 813–14; Moody, 830 S.W.2d at 700.  Conflicts in testimony do
not require reversal of a conviction when there is enough credible testimony to
support the conviction.  Moody, 830 S.W.2d at 700.

ii.  The Elements of
Murder and Analysis

We measure the sufficiency of the
evidence by the elements of the offense as defined by a hypothetically correct
jury charge.  Villarreal v. State, 286
S.W.3d 321, 327 (Tex. Crim. App.  2009) (citing Malik v. State, 953
S.W.2d 234, 240 (Tex. Crim. App. 1997)).  Such a charge is one that accurately
sets out the law, is authorized by the indictment, does not unnecessarily
increase the State’s burden of proof, or unnecessarily restrict the State’s
theories of liability, and adequately describes the particular offense for
which the defendant was tried.  Id.  A person
commits murder if he intends to cause serious bodily injury and commits an act
clearly dangerous to human life that causes the death of an individual.  Tex. Penal Code Ann. § 19.02(b)(2).

After reviewing the evidence in the
appellate record, we conclude a rational jury could have found beyond a
reasonable doubt that appellant committed murder.  See Jackson, 443
U.S. at 326.  Hicks and Lopez testified they saw appellant commit the shooting
and had known him for many years and identified him with certainty.  Miller’s
testimony about the shooter’s height also implicated appellant, and it was for
the jury to consider and weigh evidence in the record that one of appellant’s
friends, Guidry, was also tall.  Like Hicks and Lopez, Miller testified the
shooter was standing with two other males at the time of the shooting.  As set
forth above, Miller testified he saw a tall figure whom he identified
as appellant cross the street to the park.  Miller did not see the shooter’s
face, but testified appellant was the tallest in appellant’s group of friends
and it was the tallest person, standing in the middle of a group of three, who
fired.  Miller testified he saw “flames” come from this person.  Dizavian Sam
testified the shots came from appellant’s direction.  The jury was free to
believe the testimony of the State’s witnesses and to disbelieve appellant’s
witnesses.  See Mercier,
164 S.W.3d at 813–14; Moody, 830 S.W.2d at 699–700.  

The jury was also free to consider
appellant’s father’s testimony that appellant disappeared for several days
after the shooting as evidence of appellant’s consciousness of guilt.  “A
‘consciousness of guilt’ is perhaps one of the strongest kinds of evidence of
guilt.”  Hyde v. State, 846 S.W.2d 503, 505 (Tex. App.—Corpus Christi
1993, pet. ref’d) (quoting Torres v. State, 794 S.W.2d 596, 598–600
(Tex. App.—Austin 1990, no pet.)).  “It is consequently a well accepted
principle that any conduct on the part of a person accused of a crime
subsequent to its commission, which indicates a ‘consciousness of guilt’ may be
received as a circumstance tending to prove that he committed the act with
which he is charged.”  Torres, 794 S.W.2d at 598 (internal quotations
omitted).  Evidence of flight shows a consciousness of guilt of the crime for
which the defendant is on trial.  Bigby v. State, 892 S.W.2d 864,
884 (Tex. Crim. App. 1994), overruled in part on other grounds by
Tennard v. Dretke, 542 U.S. 274 (2004).  Here,
appellant’s father testified it was unusual for appellant to leave his home for
several days without telling his family members where he was going.  Appellant
left his home shortly after the shooting of the victim, when at least two
members of his household had received information implicating appellant as the
shooter.  See id.  Appellant’s second issue
is overruled.    

B.  
 Appellant’s
Challenge for Cause to a Venireperson 

            By his first issue on appeal, appellant
argues the trial court abused its discretion by denying his challenge for cause
to a prospective juror who worked as a prison supervisor.  Appellant argues
that because the trial court denied his challenge for cause concerning this
venireperson, he was forced to use a peremptory strike to remove him from the
jury panel and as a result, another objectionable juror was seated because
appellant did not have a peremptory strike to use against her.  The record
shows that after initially expressing bias in favor of the State, the prison
supervisor stated he could follow the law and serve as an impartial juror:

DEFENSE COUNSEL: . .
. Your punishment range is 5 to 99 years or life. . . . Now, what that tells me
is you don’t automatically think a life for a life.  Well, the range is wide. 
That means that in order for you to say I’ll give consideration, the Judge used
the term “good faith consideration,” okay.  That means that you have to
honestly say I will consider all of it, from 5 all the way up to life.  You
can’t be going in saying, well, in a murder case, I’m always going to be on the
heavy side.  You have to be able to wait, hear what the facts of the case are
and then make a decision.  Does everybody understand that?  I don’t want
anybody coming in with any preconceived notions.  Do I have anybody that’s
dealing with that now?  Yes, sir.

 

A JUROR:  I do.

DEFENSE COUNSEL:  And
you are Juror No. 11.  Is it [venire person’s surname]?

 

VENIREPERSON:  Yes.

 

DEFENSE COUNSEL:  Tell me what you’re thinking, sir.

 

VENIREPERSON:  I work
in the prison system.  I’m a supervisor of a prison.

 

THE COURT:  We’ll talk to him in a few minutes.

 

Subsequently, before the trial court,
without the presence of the entire panel, the venireperson in question explained
his bias as follows:

DEFENSE COUNSEL:  . .
. [Y]ou started to tell us in response to one of my questions that you work in
the prison and I think you were going to tell us that it gives you some opinion
one way or the other; but I don’t want to put words in your mouth.

 

VENIREPERSON:  Yes,
sir, it does.  I’ve worked for the prison system for 14 and a half years and
it’s just – I’m not saying he’s guilty, but just my feeling, it’s – it’s like
I’m almost on you-all’s side just a little bit.

 

DEFENSE COUNSEL:  When
you say “you-all’s side,” because I want to keep the record clear, you’re
actually pointing towards the State prosecutor when you say that; it that
right?

 

VENIREPERSON:  Yes,
sir.

 

DEFENSE COUNSEL:  You
remember I gave you an example that I get to start out ahead of [the
prosecutor] and if you’re at a race line, because of the presumption of
innocence, I’m supposed to start out ahead?

 

VENIREPERSON:  Yes,
sir.

 

DEFENSE COUNSEL:  Am
I going to get to start out ahead in this race with you?

 

VENIREPERSON:  I
think it will be even.  I don’t think it would be.

 

DEFENSE COUNSEL:  You
understand the presumption of innocence and I’m supposed to start out ahead?

VENIREPERSON:  Yes,
sir.

 

DEFENSE COUNSEL:  And
are you not going to get to do that?

 

VENIREPERSON:  I’m
just telling you how I feel.

 

DEFENSE COUNSEL: 
Remember, I’m going to respect your opinion.  I’m just trying to make sure I
understand your opinion.

 

VENIREPERSON:  Yes,
sir.

 

DEFENSE COUNSEL:  Do
I understand you’re going to force me to be on a level playing field with him,
starting out at the start line together?

 

VENIREPERSON:  I
think it’s going to be even between both of you-all; but just my feeling with
me working in the prison, with the things that I have to go through and the
things I have gone through, I just don’t think I could be that fair.

 

DEFENSE COUNSEL:  If
you were Mr. Green, do you think that –

 

VENIREPERSON:  If I
was Mr. Green, I wouldn’t want me sitting up there, Judge.

 

DEFENSE COUNSEL: 
Now, tell me why.

 

VENIREPERSON: 
Because I just don’t think it would be fair to him.

 

THE COURT:  Say that
again, sir.

 

VENIREPERSON:  I
don’t think it would be fair to him. If I was Mr. Green and I was sitting in
Mr. Green’s seat, I don’t think it would be – I don’t think it would be fair.

 

DEFENSE COUNSEL: 
Because you’re leaning toward the State?  They are already starting out, giving
them some – some head start to some degree, right?

 

VENIREPERSON:  I
guess.

 

THE COURT:  Why do
you – can you articulate for us why you think it wouldn’t be fair for you, if
you were him, to pick you as a juror?

 

VENIREPERSON:  I just
from – I don’t know if it sounds right – just from me being in the prison.

 

THE COURT:  What
about it?

 

VENIREPERSON:  I’ve
been assaulted in the prison.  I’ve been stabbed in the prison and going to
court, coming from court and I just don’t think it would be fair, sir.  I don’t
know if it’s not making any sense what I’m saying.

 

THE COURT:  I’m just
asking you.  I know you’re making that conclusion, but do those experiences
tend to make you feel a little biassed [sic] against someone who is charged
with a crime?

            

VENIREPERSON:  Yes.

 

THE COURT:  Not to
put words in your mouth but –

 

VENIREPERSON:  It’s
like that but I don’t think it’s 100 percent and when I walked in and you-all
was talking about like it was murder and when I walk in the prison and I’m with
murderers and they might do stuff and I have to investigate the situation and,
you know, it’s just hard for me.  It’s just hard. 

 

            After this exchange, in response to
questioning from the State and the trial court, the venireperson stated he
would hold the State to its burden of proof, he could be fair and impartial if
he were a juror in this case and reach a decision based upon the law and the
evidence without reference to his personal experiences.  Afterward, when
defense counsel asked the venireperson whether he had changed his position, he answered
it was not a change in position; he had just been expressing his discomfort
which stemmed from his work as a prison supervisor.  In response to a question
from defense counsel, the venireperson answered that he did not have anything
against appellant and if he had to vote on guilt-innocence during voir dire, he
would vote “not guilty” because of the presumption of innocence. 

 

            

            i.  Standard of
Review for Denial of a Challenge for Cause

            A defendant may properly challenge any
prospective juror who has a bias or prejudice against the defendant or any
phase of the law upon which he is entitled to rely.  See Tex. Code Crim. Proc. Ann. art.
35.16(a)(9), (c)(2) (West 2006).  When reviewing a trial court’s decision to
grant or deny a challenge for cause, we look at the entire record to determine
if there is sufficient evidence to support the trial court's ruling.  Feldman
v. State, 71 S.W.3d 738, 750 (Tex. Crim. App. 2002), superseded by
statute on other grounds, Tex. Code
Crim. Proc. Ann. art. 37.071, as recognized in Coleman v. State,
No. AP–75478, 2009 WL 4696064 (Tex. Crim. App. Dec. 9, 2009) (per curiam); Patrick
v. State, 906 S.W.2d 481, 488 (Tex. Crim. App. 1995).  The test is whether
the bias or prejudice would substantially impair the prospective juror’s
ability to carry out his oath and instructions in accordance with the law.  Feldman,
71 S.W.3d at 743–45.  Before a prospective juror may be excused for cause on
this basis, however, the law must be explained to him and he must be asked
whether he can follow that law regardless of his personal views.  Id.  

            The proponent of a challenge for cause bears
the burden of establishing that his challenge is proper.  Id. at 747.  The
proponent does not meet his burden until he has shown that the veniremember
understood the requirements of the law and could not overcome his prejudice
well enough to follow it.  Id.  When the record reflects that a
venireperson vacillated or equivocated on his ability to follow the law, the
reviewing court must defer to the trial court’s decision on a challenge for
cause.  Moore v. State, 999 S.W.2d 385, 400 (Tex. Crim. App. 1999); Brown
v. State, 913 S.W.2d 577, 580 (Tex. Crim. App. 1996).  We give great
deference to the trial court’s decision because the trial judge is able to
observe the venireperson’s demeanor and to listen to his tone of voice.  Feldman,
71 S.W.3d at 744.

            ii.  Preservation
of Error  

To
preserve error on the denial of a challenge for cause, an appellant must
demonstrate on the record that (1) he asserted a clear and specific challenge
for cause, (2) he used a peremptory challenge on the complained-of
venireperson, (3) all of his peremptory challenges were exhausted, (4) his
request for additional strikes was denied, and (5) as a result, an
objectionable juror sat on the jury.  Feldman, 71 S.W.3d at 744.  Error
is not preserved when an appellant waits until after the parties have made
peremptory challenges and the identities of the jurors are revealed, to advise
the trial court that a peremptory challenge was used to strike a venireperson
who was challenged for cause, to request an additional peremptory strike, and
to identify a chosen juror as someone against whom he would have used a
peremptory challenge.  McBean v. State, 167 S.W.3d 334, 339 (Tex.
App.—Amarillo 2004, pet. ref’d).

Here,
appellant failed to preserve error concerning the trial court’s denial of his
challenge for cause to the male venireperson who worked as a prison supervisor. 
Appellant did not request an additional peremptory challenge and identify the
female venireperson as objectionable until after the parties exercised their
peremptory challenges and he saw the juror list.  See id.  Further, even
if appellant had preserved error, we defer to the trial court’s decision to
deny appellant’s challenge for cause because the record shows the prison
supervisor was a vacillating juror who ultimately stated he could impartially
follow the law.  See Brown, 913 S.W.2d at 580–81.  In Brown, the
Court of Criminal Appeals held it was bound to defer to the trial court’s
denial of a challenge for cause to a venireperson who vacillated between stating
she would be able to follow the law and stating she did not know for certain
whether she could follow the law.  Id.  Appellant’s first issue is
overruled.

III. 
Conclusion

            We
affirm the trial court’s judgment.

                                                                                                                                                 

                                                                                         Gregory T. Perkes

                                                                                         Justice

 

Do not publish.  Tex. R. App. P. 47.2(b).

 

Delivered and filed the


23rd day of August,
2011. 









[1]  Pursuant to a docket-equalization
order issued by the Supreme Court of Texas, this case is before us on transfer
from the Ninth Court of Appeals in Beaumont, Texas.  See Tex Gov't Code Ann. § 73.001 (West
2005).

 





[2]  After counsel filed a brief on appellant's behalf,
appellant filed a pro se brief raising additional issues.  We will not address
these issues as appellant has no right to hybrid
representation. See Scheanette v. State, 144 S.W.3d 503, 505 n.2 (Tex. Crim.
App. 2004).

 





[3]  According to testimony in the
record, Gilham Circle is the street surrounding the Barbara Jacquet Park.





[4]  The testimony in the record
concerning the name of the store varied between “Dollar General,” “Family
Dollar,” and “the dollar store.”  





[5]  The record shows one of appellant’s
friends was called “Denzel Washington,” but he is not the famous actor named
Denzel Washington.   





[6]  James Keal’s testimony was slightly
different than that of appellant’s other friends.  Keal testified appellant was
his best friend.  Keal admitted police detained Keal for about thirty to
forty-five minutes at the bus barn because he was in possession of marihuana. 
Keal testified he does not know where appellant was during that time, but that
he subsequently met appellant at Fairman’s house before a group of males came
by on foot and started shooting at the house. 





[7]  At the time of trial, Samuel
Washington was a recent high-school graduate.  He testified he grew up with
appellant and they were close friends.  He testified that after the police
intervention at the bus barn, he walked along Eighth Street alone and later met
up with his group of friends at appellant’s grandmother’s house.  He estimated
he was apart from his friends for ten to fifteen or thirty minutes.